IN THE OREGON TAX COURT
REGULAR DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | ) ) ) | |
| Plaintiff, | ) | **TC 5413** |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) ) | **ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION** |

This matter is before the court on Plaintiff's motion under Tax Court Rule (TCR) 80A for reconsideration of the court's August 29, 2024, Order on Cross-Motions for Summary Judgment (August 29 Order). The first part of the August 29 Order grants relief to Plaintiff to the extent of concluding that ORS 314.665(6)(a) requires the 20 Percent Repatriation Amount to be reincluded in the sales factor of Plaintiff's Water's Edge Group as a deemed dividend.[1] The court uses the term "Post-Reinclusion Assessment" to refer to the assessment amount, as reduced by the dilutive effect of reincluding the 20 Percent Repatriation Amount in the sales factor. The second part of the August 29 Order rejects Plaintiff's argument for further factor relief under Oregon's "safety valve" statute, ORS 314.667, concluding that Plaintiff failed to carry its burden

---

[1] Terms used in this order have the meanings assigned in the August 29 Order.

of proof that even the unreduced assessment violates either the statutory "fairly represent" standard or constitutional standards.[2]

Plaintiff now seeks reconsideration of the second part of the August 29 Order, specifically objecting to the use of Defendant's proffered adaptation of the "Augusta Formula" when testing for constitutional factor relief. That adaptation essentially extends the Augusta Formula over the nearly twenty-year period during which the CFCs accumulated the earnings and profits that were deemed distributed in TYE 2018. The adaptation thus includes the *sum of each past year's* Oregon taxable income that would have been due under worldwide combined reporting, an amount that the court now refers to as the Retrospective Worldwide Amount.[3] The August 29 Order then compares the Retrospective Worldwide Amount to the assessment. Because the Retrospective Worldwide Amount is greater than the assessment, the August 29 Order concludes that Plaintiff has not shown that either the original assessment amount or the Post-Reinclusion Assessment Amount fails the statutory "fairly represent" standard or constitutional standards. Plaintiff's motion for reconsideration focuses on why the court should apply a different version of the Augusta Formula, as described below.

Defendant objects to Plaintiff's motion but does not itself move for reconsideration of either part of the August 29 Order, citing the court's rule disfavoring "[c]laims addressing legal issues already argued in the parties' briefs and addressed by the court." TCR 80A A(4). But

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to the 2015 edition.

[3] Following entry of the court's August 29, 2024, Order on Cross-Motions for Summary Judgment, the parties reached a Stipulation on Computational Issues ("Stipulation"), which was filed with the court on January 10, 2025. The court has reviewed the parties' Stipulation, and the figures therein, and has determined that while it will result in a slightly different refund amount for Plaintiff, it does not materially change the outcome on any of the legal issues addressed in this Order or in the Amended Order on Cross-Motions for Summary Judgment. Therefore, unless otherwise noted, this Order continues to refer to the amounts before the court at the time the August 29 Order was entered.

Defendant urges that, if the court were to grant Plaintiff's motion, the court should also take up Defendant's argument under the first part of the August 29 Order that reinclusion of the 20 Percent Repatriation Amount is inherently distortive. (Def's Response Reconsider at 9-10.)

In its discretion, the court will reconsider the August 29 Order as requested by Plaintiff, even though on summary judgment the parties extensively briefed and argued their respective positions regarding the constitutional fairness requirement on which the Augusta Formula is based. The court is moved to address Plaintiff's new, more targeted, arguments in the interest of judicial economy, because of the potential that they otherwise could be raised for the first time in a further appeal. *See* ORS 305.445 (scope of Supreme Court review includes "errors or questions of law").

Accordingly, this order will first analyze Plaintiff's arguments for its version of the Augusta Formula. Thereafter, this order will also address Defendant's request, in order to clarify the court's reinclusion analysis. For the reasons discussed below, the court will not change its ultimate conclusions, or any results, under either part of the August 29 Order. The court will today, however, issue an Amended Order on Cross-Motions for Summary Judgment (Amended Order) that restates its decision in full, with amendments to portions of its reasoning and correction of minor errors, most of which were helpfully identified by the parties.

A.      *Plaintiff's Arguments*

According to Plaintiff, the Retrospective Worldwide Amount is an invalid comparator. Instead, Plaintiff urges the court to compare the Post-Reinclusion Assessment Amount solely to the *TYE 2018* Oregon taxable income that would have been due under worldwide combined reporting, a comparator that the court now refers to as a Single-Year Worldwide Amount. Plaintiff reasons that Congress chose to require taxpayers to include the Federal Repatriation

Amount in the tax base for a single tax year, instead of requiring taxpayers to amend their federal income tax returns for prior years, and a fairness analysis for state apportionment purposes must be based on that reality. The formula Plaintiff uses to derive its Single-Year Worldwide Amount is to add the Federal Repatriation Amount to the taxable income of the Water's-Edge Group for TYE 2018, then to multiply that sum by a fraction, of which the numerator is Oregon sales for TYE 2018 and the denominator is the sum of (1) sales everywhere by the Water's-Edge Group for TYE 2018 and (2) cumulative sales by the CFCs for TYE 2000 through 2018. (*See* Ptf's Mot Recons at 5, Table 3 (labeled in the motion as "WW Comparison").

Plaintiff's proffered Single-Year Worldwide Amount is less than the Post-Reinclusion Assessment Amount. (*Compare* Ptf's Mot Recons at 5, Table 3 (showing TYE 2018 Oregon taxable income of $112,740,081 as Plaintiff's Single-Year Worldwide Amount *with* Ptf's Mot Recons at 5, Table 2 (showing TYE 2018 Oregon Taxable Income of $163,223,673 as the court's Post-Reinclusion Assessment Amount pursuant to the August 29 Order).)[4] Plaintiff argues that this fact proves "unconstitutional distortion." (Ptf's Mot Recons at 2.) According to Plaintiff, the court must address this distortion by capping Oregon taxable income for TYE 2018 at the Single-Year Worldwide Amount. (*See* Ptf's Mot Recons at 6 ("Factor relief must be provided so that Microsoft's taxable income for TYE 2018 does not exceed the amount that would have been owed under the worldwide combined reporting method for TYE 2018.").)

Plaintiff also argues that a Retrospective Worldwide approach is inaccurate because it "introduces a systematic error into the analysis" that produces a tax result different from a Single-Year Worldwide Amount. (Ptf's Reply at 5.) Plaintiff illustrates its point with examples

---

[4] The court notes that the parties' January 10, 2025, stipulation further reduced the Post-Reinclusion Assessment Amount to $161,965,650. (*See* Stipulation on Computational Issues at 2 ¶4.b. (Jan 10, 2025).)

involving different profit margins as between a hypothetical water's-edge group and its CFCs. Only in the "unusual case where the profitability of the domestic and foreign operations is identical" is the same amount of income apportioned under both a Retrospective Worldwide approach and a Single-year Worldwide approach. (*Id*. at 6.) And where the CFCs have a profit margin higher than that of the water's-edge group, the Retrospective Worldwide approach disfavors the water's-edge group by apportioning a higher amount of income domestically.

B.      *Defendant's Responses*

Defendant primarily attacks Plaintiff's use of a single tax year to gauge the fairness of tax on unitary dividends built up over many years. (*See* Def's Surreply at 3-4.) The Maine Supreme Court's approval of the Maine taxing authority's adoption of the Augusta Formula is premised on the principle that the worldwide combined reporting method for a unitary group, as approved in *Container Corp.*, presumably satisfies the constitutional requirements of fairness. *See E.I. Du Pont de Nemours v. State Tax Assessor*, 675 A2d 82, 90 (Me 1996) ("The Augusta Formula simply adopts the worldwide reporting method as a means of verifying the fairness of the tax liability of the unitary business as established by the tax assessor. The worldwide reporting method is widely acknowledged as a fair and accurate method of estimating a multijurisdictional corporation's taxable business activities in the state, and the Supreme Court has repeatedly upheld the constitutionality of this method of accounting."). Therefore, the more a formula deviates from that method, the more suspect the result becomes as a measure of fairness. Defendant argues that Plaintiff's formula incorrectly ignores the basic unitary principle that the Federal Repatriation Amount must be eliminated from the tax base as a deemed dividend. (*See* Def's Resp Recons at 5 ("Because the worldwide group is looked at as a whole, a proper application of the worldwide method requires the elimination of intercompany transactions

among the members of the worldwide group, including dividends or deemed dividends.").) And because the tax base is determined annually, the only reasonably accurate starting point to estimate the effect of eliminating an intra-group dividend comprising earnings and profits that have accumulated over many years is to redetermine the entire group's income for each such year. According to Defendant, a formula that lacks this retrospective feature strays too far from a true worldwide combined apportionment method.

Defendant also criticizes Plaintiff's formula as logically inconsistent. Although Plaintiff emphasizes the reality that Congress required the Federal Repatriation Amount to be included in the tax base for only one year, Plaintiff's formula puts nearly 20 years of cumulative CFC sales into the sales factor denominator, along with only one year of sales by the Water's-Edge Group. Defendant argues that this improperly "ignor[es] the activity of the domestic portion of the unitary business" over the same time period. (Def's Surreply at 3.) Defendant essentially views Plaintiff's attempt to adhere to Congress's use of a single tax year as a red herring, given the lack of any indication that Congress considered state apportionment of income in the TCJA. (*See id.* ("Nor did 'Congress mandate[ ]' that 19 years of CFC sales be recognized in the sales factor denominator * * *.").)

Finally, Defendant rejects Plaintiff's "systematic error" argument, which depends on hypothetically different domestic vs. foreign profit margins; Defendant characterizes the argument as a request for separate accounting based on geography. Defendant quotes the Court's rejection of a similar argument by the taxpayer in *Container Corp.*:

> "Appellant * * * argues that its foreign subsidiaries are significantly more profitable than it is, and that the three-factor formula, by ignoring that fact and relying instead on indirect measures of income such as payroll, property, and sales, systematically distorts the true allocation of income between appellant and the subsidiaries. The problem with this argument is obvious: the profit figures relied on by appellant are based on precisely the sort of formal geographical accounting whose basic theoretical weaknesses justify

resort to formula apportionment in the first place."

*Container Corp. v. Franchise Tax Bd.*, 463 US 159, 181, 103 S Ct 2933, 77 L Ed 2d 545 (1983).

(*See* Def's Surreply at 5-6 (quoting portion of foregoing excerpt).)

C.      *Analysis and Conclusions as to Single-Year vs. Retrospective Worldwide Methods*

Overall, the court understands Plaintiff to contend on reconsideration that the result of

applying the Retrospective Worldwide Comparator is unconstitutionally distortive because it

fails to "actually reflect a reasonable sense of how [the Section 965] income is generated." *Id*. at

169.  (*See* August 29 Order at 44.)[5]  Plaintiff emphasizes the undisputed fact that the Federal

---

[5] The court rejects three other arguments stated or implied in Plaintiff's motion for reconsideration.  First, Plaintiff at times seems to criticize a Retrospective Worldwide approach simply because it "depart[s] from the way that the Formula has previously been applied."  (Ptf's Mot Recons at 2.)  The court rejects the apparent premise that the court is bound by the precise contours of the Augusta Formula as applied by the sister state of Maine.  This court refers to the Augusta Formula solely for its persuasive value as useful to the ultimate end of testing for fairness. (*See* August 29 Order at 48 n 48.)

For the same reason, the court rejects any argument that the worldwide comparator under the Augusta Formula, or any adaptation thereof, serves only as a cap that requires an automatic refund of any amount of tax exceeding the result under that comparator.  Although the Augusta Formula as approved by the Maine courts apparently did treat the worldwide comparator as a cap, that was not a feature of the courts' making.  Rather, the Augusta Formula was a bright-line policy developed by the state taxing agency pursuant to its discretion under Maine's "safety valve" statute.  *Du Pont*, 675 A2d at 84, 89-90.  The Maine Supreme Court treated the agency's formula as an administrative safe harbor, not as a constitutional mandate.  *See id.* at 89 ("we review the Assessor's Augusta Formula to determine whether it *ensures* that Du Pont's tax liability 'fairly represents' its business activity in the state of Maine consistent with constitutional due process.") (emphasis added); *id*. at 90-91 ("Thus, each calculation pursuant to the Augusta Formula represents permissible means of *insuring* that the State in its assessment does not capture extraterritorial value * * *.") (emphasis added).  Indeed, the Maine court emphasized that the constitutional tests contemplate "rough approximation rather than precision * * *."  *Id.* at 90.  This court sees no basis to import a rigid notion that the Augusta Formula, or any variation on it, must serve as a cap.

Finally, in the absence of any clear-cut "cap" on the amount of income a state may assign to itself under an apportionment formula, the requirement to prove "gross" distortion remains.  (*See* August 29 Order at 45-46.)  In its motion for summary judgment, Plaintiff essentially argued that the original assessment, unreduced by reinclusion of the 20 Percent Repatriation Amount in the denominator of the sales factor, overstates Plaintiff's Oregon taxable income by approximately 182 percent.  (*See id.* at 46.)  The court concluded that, "if the relative percentage difference were the only test for unfair apportionment, Plaintiff's claim would not fail as a matter of law."  (*Id.*)  On reconsideration, Plaintiff shifts its attention to the Post-Reinclusion Assessment Amount, which, as shown above, exceeds Plaintiff's proffered Single-Year Worldwide Amount, but only by approximately 44 percent.  This 44 percent increase falls short of the approximately 48 percent increase that the Court sustained in *Moorman Mfg. Co. v. Bair*, 437 US 267, 271 n 4, 98 S Ct 2340, 57 L Ed 2d 197 (1978) (upholding state's income apportionment formula based solely on in-state sales despite resulting increase in tax base of approximately 48 percent compared to apportionment based on three equally weighted factors--property, payroll, and sales).  Thus, even if the court were persuaded that Defendant's Retrospective Worldwide approach is inaccurate, or not reflective of reality, it is doubtful that the Post-Reinclusion Assessment Amount would rise to the level of "gross" distortion.  The court's decision that the Retrospective Worldwide Amount is theoretically sound, and thus not "distortive," makes it

Repatriation Amount was triggered by a highly unusual act of Congress. The court disagrees with Plaintiff's position and, at least on the factual record in this case, agrees with Defendant's objection on this major point. Like all kinds of intercompany transactions, dividends paid within a unitary group must be eliminated under the kind of worldwide unitary combined reporting regime approved in *Container Corp. See* Jerome R. Hellerstein, Walter Hellerstein, Andrew D. Appleby, 2 *State Taxation* ¶9.15[5] (3d ed, 2024) ("Under combined reporting, intercompany transactions, including dividends, interest, and royalties, are eliminated insofar as they reflect income from the unitary business."). The main purpose of such a regime is to tax an appropriate percentage share of the annual income of the entire unitary business enterprise without regard to lines drawn between corporate members of the group. *See e.g. Coca Cola Co. v. Dept. of Rev.*, 271 Or 517, 523, 533 P2d 788 (1975) (quoting Keesling and Warren, *The Unitary Concept in the Allocation of Income*, 12 Hastings J 42, 46 (1960) ("When the properties and activities within the jurisdiction are an inseparable portion of a business carried on within and without the jurisdiction, the computation on the income attributable thereto requires a computation of the income of the business as a whole or as a unit and an apportionment or allocation of the total to the various parts.").) And those lines can greatly affect the timing of recognition of income: for example, the price that one affiliate charges another for goods, services, or intellectual property can allow profit to build up in one or the other of them until a dividend or other realization event occurs in a later year. Determining the worldwide combined income of the overall enterprise requires the unwinding of deferrals arising from intercompany transactions and thus the redetermination of enterprise-wide income for the years to which those transactions relate, at

---

unnecessary to decide whether the Post-Reinclusion Assessment is "grossly" distortive.

least when numerous tax years are involved.[6]  While it is true that Congress did not require taxpayers to redetermine federal income for prior years, or file amended returns, *Moore v. United States* leaves no doubt that Congress's goal was to create a one-time increase in the tax base that was entirely consistent with Defendant's Retrospective Worldwide adaptation of the Augusta Formula.  *See Moore v. United States*, 602 US 572, 144 S Ct 1680, 219 L Ed 2d at 285-86 ("[T]he 2017 Act imposed a one-time, backward-looking tax on that accumulated income. That backward-looking tax * * * attributed the long-accumulated and undistributed income of American-controlled foreign corporations to American shareholders * * *.").  Like the substantially reduced special federal tax rate that Congress applied to the Federal Repatriation Amount, the requirement to add that amount to only a single year's income may simply have been a practical modification to reduce the administrative burden for taxpayers and the government alike.

As to Defendant's criticism that Plaintiff's Single-Year Worldwide method is logically inconsistent, the court believes that the real problem lies in Plaintiff's use of a single year's tax base, as just discussed.  Once the die is cast in favor of abandoning nearly 20 years of intragroup

---

[6] The Maine decisions involving the Augusta Formula do not distinguish between dividends paid out of current-year vs. accumulated earnings and profits, but at least some portion consisted of subpart F income, which at that time consisted, by definition, of current-year earnings and profits. *See Du Pont De Nemours & Co. v. State Tax Assessor*, 1995 WL 18022834, at *1 (Me Super Mar 3, 1995) ("Under sections 951 through 964 of the Internal Revenue Code, du Pont and domestic affiliates were deemed to have received additional dividends (the 'Subpart F income') from certain of the unitary foreign subsidiaries."); IRC § 952(c)(1)(A) (1986) (in part) ("the subpart F income of any controlled foreign corporation for any taxable year shall not exceed the earnings and profits of such corporation for such taxable year.").  To the extent that this court breaks new ground in requiring redetermination of the unitary group's prior-year income under the Retrospective Worldwide approach, the court reiterates that the data to do so generally should be available using the records required to be kept under federal law to distinguish between a distribution "out of [the corporation's] earnings and profits," constituting a taxable dividend, and one that is a nontaxable return of capital. *See* IRC § 316(a) (defining "dividend"); Boris I. Bittker & Laurence Lokken, 4 *Federal Taxation of Income, Estates and Gifts*, ¶ 92.1.3 (3d ed, 2003) ("Because there is no statute of limitations on the effect of prior transactions on accumulated earnings and profits, permanent retention of corporate records is advisable.") (footnote omitted).  In this case, at least, Defendant was able to redetermine worldwide combined income for the prior years using data from Plaintiff. (*See* August 29 Order at 48 ("Plaintiff does not contest the accuracy of Defendant's calculations [under the Augusta Formula], only their relevance.").)

eliminations and thus abandoning the redetermination of enterprise-wide income, it becomes difficult to construct a coherent rationale for other components of a worldwide formula.

Finally, the court also agrees with Defendant that Plaintiff's hypothetical examples of different profit margins for the water's-edge group vs. the CFCs are, in substance, a request for separate accounting incompatible with the unitary worldwide combined theory approved in *Container Corp.* As the Court first stated in *Mobil Oil Corp. v. Vermont*, 445 US 425, 437, 100 S Ct 1223, 63 L Ed 2d 510 (1980):

> "[S]eparate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale."

*See also Container Corp.*, 463 US at 181 (rejecting similar argument); *see generally* Hellerstein at ¶ 8.03 (explaining drawbacks of separate accounting generally). Similar arguments regarding the relative profitability of individual entities engaged in a unitary business were ultimately rejected by the Maine Supreme Court in *Du Pont*. In that case, the taxpayer successfully argued before the Superior Court, relying on the court's internal consistency analysis in *Tambrands*, that the Augusta Formula is not internally consistent when applied to a unitary business whose subsidiaries are more profitable than the parent. *Du Pont*, 1995 WL 18022834, at *4 (Me Super Mar 3, 1995) ("The class of unitary businesses to which du Pont belongs, those with unitary foreign affiliates that are, in the aggregate, more profitable than the domestic affiliated group, will just as inevitably be subject to tax on more than 100% of the income of the unitary business under the Augusta Formula applied in all jurisdictions."). However, the Maine Supreme Court ultimately came to understand its internal consistency analysis in *Tambrands* as flawed, abandoning it in *Du Pont*. *See Du Pont*, 675 A2d at 89 ("It is now clear to us that in applying the internal consistency test in *Tambrands*, we improperly applied the test to two different taxpayers-

-Tambrands and its subsidiaries--rather than to just Tambrands. Moreover, by misidentifying the taxpayer in our application of the internal consistency test in *Tambrands* we insured that no apportionment method other than complete exclusion of the foreign subsidiaries' income and dividends would satisfy the test.").

D.    *Defendant's Objection That Reinclusion Is Inherently Distortive*

The court now turns to Defendant's request that the court address Defendant's argument that reinclusion of the 20 Percent Repatriation Amount in the denominator of the sales factor causes an inherently distortive amount of income to be assigned to Plaintiff's state of commercial domicile. In part, Defendant grounds its request in the court's discussion of the concept of "income-producing activities," particularly in footnote 25 of the August 29 Order. As Defendant points out, "[a]t times, the court appears to suggest that the relevant income-producing activity is the CFCs' activity, rather than the activity of some member of the Water's Edge Group.  * * * But in that case, the 20 Percent Repatriation [Amount] would be included in the sales numerator of *no* state applying a water's-edge regime, which necessarily excludes the CFCs. Such a method is inherently dilutive." (Def's Resp Recons at 3 (emphasis in original).)

The court agrees that the August 29 Order is unclear on this point. As will be reflected in the Amended Order, for purposes of reinclusion under ORS 314.665(6)(a), the 20 Percent Repatriation Amount must be sourced as a dividend, because the legislature's decision in 1984 to adopt a water's-edge reporting regime prescribed that result by putting an end to worldwide combined reporting and the elimination of intragroup dividends. Therefore, as with any other dividend that is business income, it is the location or locations of the income-producing activities of the water's-edge group, and the costs of performing those activities, that determine the state, or states, to which the 20 Percent Repatriation Amount is sourced.

There is little case law or other guidance on how to identify those activities, where the payor and payee of a dividend engage in the same unitary business but do not join in the same tax return. Specifically, courts have not clearly identified whether the relevant activities are those that trigger payment of the dividend, or those related to managing and participating in the underlying unitary business activities engaged in by entire worldwide group, or both such types of activities. Nevertheless, the inquiry is clearly factual, setting a high bar for assertions that any particular result is "inherently" distortive. It is also clearly incorrect to frame the inquiry by reference to activities performed by the CFCs as opposed to activities performed by the water's-edge group. For these two reasons, Defendant's concern that the 20 Percent Repatriation Amount would necessarily be "included in the sales numerator of *no* state" is unfounded. Defendant's objection thus reduces to one of two assertions:

- To the extent that Defendant argues as a matter of law that assigning the 20 Percent Repatriation Amount to *any* single state is somehow inherently distortive, the court rejects Defendant's position because the requirement in ORS 314.665(4)to source sales to the location of the greater proportion of income-producing activities based on costs of performance squarely contemplates factual analysis. The statute provides no shortcut to that work.

- To the extent that Defendant argues as a matter of fact that assigning this Plaintiff's 20 Percent Repatriation Amount to the *state of Washington* is inherently distortive, the record before the court does not support that conclusion. Suffice it to say that well over one-half of all Water's Edge Group employees were located in Washington, as were Plaintiff's headquarters. Under any definition of the income-producing activities giving rise to the 20 Percent Repatriation Amount, these facts do not support a conclusion that assigning receipts to Washington is inherently distortive; if anything, they tend to suggest that the greater proportion of those activities may well have been in Washington. Now, therefore,

/ / /

/ / /

/ / /

IT IS ORDERED that

(1)     Plaintiff's motion for reconsideration is granted;

(2)     Upon reconsideration, the court adheres to the overall conclusions reached in its August 29, 2024, Order on Cross-Motions for Summary Judgment, granting and denying in part each party's cross-motion;

(3)  Amendments and corrections to the August 29, 2024, order are reflected in the Amended Order filed separately today; and

(4)  A marked copy of the Amended Order is attached hereto as Exhibit A.

Dated this 29th day of April, 2025.

4/29/2025 9:16:09 AM

**Judge Robert T. Manicke**

IN THE OREGON TAX COURT
REGULAR DIVISION
Corporation Excise Tax

| | | |
|---|---|---|
| MICROSOFT CORPORATION,<br>a Washington corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **TC 5413** |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE,<br>State of Oregon, | ) | **{<u>AMENDED</u>} ORDER ON CROSS-** |
| | ) | **MOTIONS FOR SUMMARY** |
| Defendant. | ) | **JUDGMENT** |

I.      INTRODUCTION AND CONCLUSIONS

**{This order amends and restates the court's August 29, 2024, Order on Cross-Motions for Summary Judgment.  Amendments result from Plaintiff's Motion for Reconsideration dated October 9, 2024, and the parties' subsequent briefing followed by oral argument on January 14, 2025.  Further explanation of the parties' arguments that have prompted amendments, as well as a marked copy showing the changes in this order, are found in the court's Order on Reconsideration, issued today.}**

This is the second recent case in this court involving "deemed dividends" arising under subpart F of the Internal Revenue Code.[1]  Subpart F generally deems earnings and profits of "controlled foreign corporations" (CFCs) to have been distributed annually to their significant

---

[1] Unless otherwise indicated, references to the Internal Revenue Code (IRC or the Code) are to the federal Internal Revenue Code of 1986, title 26 of the United States Code, as amended by the 2017 act commonly known as the Tax Cuts and Jobs Act, Pub L 115-97, 131 Stat 2054 (2017), and as otherwise amended and in effect for the tax year at issue in this case.  The portion of the Code commonly referred to as subpart F consists of sections 951 through 965.

domestic shareholders as an addition to the shareholders' federal gross income, if those earnings and profits have not been subject to federal income tax in the hands of the CFCs.[2] *See* IRC § 951. The earlier case, *Oracle Corp. and Subsidiaries II v. Dept. of Rev.*, 24 OTR 359, 360 (2021) (*Oracle II*), involved tax years well before 2017, when subpart F's deemed distribution requirement applied only to certain types of "mostly passive income" earned during the tax year, thus allowing federal income tax on other types of CFC earnings and profits to continue to be deferred indefinitely. *Moore v. United States*, 602 US [___,]{**572,**} 144 S Ct 1680, 219 L Ed 2d 275, 281 (2024). The main difference is that this case involves a one-time requirement, enacted in 2017 and likewise codified in subpart F, to apply the same deemed dividend treatment to up to 31 years' worth of CFC earnings and profits on which United States taxation had been deferred under subpart F.[3] The court refers to this one-time amount, determined under federal law, as the "Federal Repatriation Amount."

The requirement to add the Federal Repatriation Amount to income was a single, transitional provision of the 2017 Tax Cuts and Jobs Act (TCJA). *See* Pub L 115-97, § 14103, 131 Stat 2054, 2195 (2017) (amending IRC § 965). Other provisions imposed a greatly reduced federal tax rate on the Federal Repatriation Amount, provided extended time to pay the additional federal tax, and prospectively changed substantial features of the federal taxation of multinational businesses. Oregon incorporated the federal requirement to add the Federal Repatriation Amount to income but did not set a lower tax rate for that amount. However, Defendant determined that an existing 80 percent "subtraction" available to certain corporate

---

[2] In this order, a "domestic" corporation refers to one incorporated under the laws of any state of the United States or under the laws of the United States; a "foreign" corporation refers to any other corporation. *See* IRC § 7701(a) (4)-(5).

[3] In this case, the deferral period is shorter; it included earnings and profits that had "accumulated since the early 2000s." (Stip Facts at 3, ¶ 11.)

taxpayers applied. The court refers to the amount remaining after subtracting 80 percent of the Federal Repatriation Amount as the "20 Percent Repatriation Amount."

The issues in this case involve how to determine Oregon's apportioned share of the 20 Percent Repatriation Amount, applying Oregon's version of the Uniform Division of Income for Tax Purposes Act (UDITPA). *See* ORS 314.615 (requiring apportionment when taxpayer has income from business activity taxable within and without Oregon); ORS 314.605(1) (defining ORS 314.605 to 314.675 as UDITPA).[4]

Plaintiff, as the domestic common parent corporation of numerous domestic and foreign subsidiaries, had a large Federal Repatriation Amount during the tax year at issue, the fiscal and tax year ending on June 30, 2018 (TYE 2018). Applying Defendant's published guidance on the TCJA when filing its original Oregon return for TYE 2018, Plaintiff included the 20 Percent Repatriation Amount in its income but did not include any portion of the Federal Repatriation Amount in either the numerator or the denominator of the apportionment fraction, which consists of gross receipts ("sales") in Oregon over gross receipts everywhere. Subject to certain computation issues to be resolved by the parties, the court refers to the amounts of Oregon taxable income and tax, as shown on the original return, as the assessment.[5]

Plaintiff paid the tax pursuant to the assessment but immediately applied for a partial refund, claiming a right to increase the denominator by the amount of the Federal Repatriation

---

[4] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to the 2015 edition.

[5] {**Following entry of the court's August 29, 2024, Order on Cross-Motions for Summary Judgment, the parties reached a Stipulation on Computational Issues ("Stipulation"), which was filed with the court on January 10, 2025. The court has reviewed the parties' Stipulation, and the figures therein, and has determined that while it will result in a slightly different refund amount for Plaintiff, it does not materially change the outcome on any of the legal issues addressed in the Amended Order on Cross-Motions for Summary Judgment or the Order on Reconsideration. Therefore, in this Order the court continues to refer to the parties' positions as they existed at the time the original Order on Cross-Motions for Summary Judgment was entered.**}

Amount, which would reduce Oregon's fractional share of Plaintiff's overall taxable income. *See* Table 1 in Part IV, below. Defendant denied the refund, adhering to its published position that no amount could be included in either the numerator or the denominator. Plaintiff appeals, presenting two main theories for its refund claim.[6]

First, Plaintiff relies on the court's analysis, in *Oracle II,* of the definition of "sales" in ORS 314.665(6)(a). That definition initially excludes deemed dividends under subpart F because they "aris[e] from the * * * holding of intangible assets"; however, an exception treats those amounts as sales if they are "derived from the taxpayer's primary business activity." *Oracle II* determined that subpart F amounts are sales under the exception if the CFC and the taxpayer were engaged together in a single unitary business and the CFC's earnings and profits constituting the subpart F amounts are from a single "primary business activity" shared by the CFC and the taxpayer. The court refers to this statutory interpretation theory as "reinclusion" of the 20 Percent Repatriation Amount in the sales factor.[7]

Second, Plaintiff seeks what is known informally as "factor representation" or "factor relief" under ORS 314.667, which allows a taxpayer to request an alternative allocation and apportionment method if the statutory method (1) fails to "fairly represent" the extent of the

---

[6] Plaintiff's first four claims seek declaratory relief. (*See* Ptf's First Amend Compl at 25-28). As a procedural matter, the court agrees with Defendant that Plaintiff is not entitled to declaratory relief, as Plaintiff has, and has exercised, a complete remedy by claiming a refund. *See Fields v. Dept. of Rev.*, 19 OTR 547, 550 (2009) ("In this case, taxpayers have a complete remedy available to them, if they are correct legally, in the form of proceedings under ORS 305.270 for refund. In such a case where a timely specific statutory remedy exists, courts should not entertain declaratory judgment actions."). Having concluded that Plaintiff is not entitled to the declaratory relief it seeks, the court treats the substance of Plaintiff's first four claims for relief as supporting its refund claim and its motion.

[7] Defendant, which was barred procedurally from appealing *Oracle II* to the Supreme Court, contests the reinclusion theory.

taxpayer's business activity in Oregon, or (2) is unconstitutional.[8] In all of its arguments, Plaintiff generally challenges the assessment as inaccurate and unfair.

The court agrees with Plaintiff as to its first theory. The court adheres to, and further explains, its reinclusion analysis in *Oracle II*. However, reinclusion does not fully resolve the parties' cross-motions because the refund amount under reinclusion is somewhat less than one-half the amount Plaintiff requests. *See* Table 2 in Part IV, below. Nominally, Plaintiff pursues its two theories independently, such that the court's decision that reinclusion applies simply reduces the amount at issue for factor relief purposes. However, Plaintiff fails to make any specific argument about the inaccuracy or unfairness of that reduced amount at issue. Plaintiff instead confines itself to arguing that the *assessment*, unmodified by reinclusion of the 20 Percent Repatriation Amount in the sales factor denominator, is inaccurate and unfair. Plaintiff thus has failed to carry its burden of proof that it is entitled to factor relief beyond what reinclusion already provides. For this reason, the court will grant summary judgment to Plaintiff in part, to the extent of awarding a refund computed under reinclusion, but the court must deny any further relief under a factor representation theory.

Mindful, however, that the Oregon Supreme Court has not had occasion to review this court's reinclusion analysis in the context of deemed dividends, the court proceeds to review Plaintiff's arguments for factor relief under ORS 314.667 based on the unmodified assessment.

As to the "fairly represent" statutory standard, Plaintiff argues that including the 20 Percent Repatriation Amount in taxable income without changing the apportionment factor is inherently inaccurate and unfair because the addition of a large amount of income to the tax base, with *no* increase in the denominator of the apportionment percentage, results in a tax amount that

---

[8] The court did not address factor relief in *Oracle II*.

is necessarily inaccurate. However, based on the legislative history of the 1984 act, the court concludes that the 80 percent subtraction under ORS 317.267(2)(b), including for dividends from foreign subsidiaries excluded from an Oregon consolidated return, functions as a form of factor representation in Oregon's water's-edge system. This leaves only the question whether the *degree* of factor representation that Oregon provides is sufficiently accurate or fair.

Considering Plaintiff's proposals for alternative methods for insight on its fairness arguments, the court is not persuaded that the assessment violates the statutory "fairly represent" standard. *See* Table 3 in Part IV, below.

- The first proposal would add to the denominator 20 percent of the CFCs' gross receipts. The court finds that this proposal goes too far in relying on the connection between the 20 Percent Repatriation Amount and the unitary business activities of the CFCs. Although the 20 Percent Repatriation Amount is eligible for reinclusion because it is "derived from" activities shared by all members of the Worldwide Group, the fact remains that the amount is a dividend in the hands of the Water's-Edge Group because Oregon's water's-edge law prevents it from being eliminated from income as an intercompany transaction and instead causes it to arise from the holding of an intangible. As a dividend, it is already a gross receipt. It is reasonable to assign that gross receipt, once, to the sales factor denominator, but to assign a *multiple* of the 20 Percent Repatriation Amount to the denominator, as Plaintiff proposes, would fail to recognize its character as a dividend.

- The second proposal would include 100 percent of the Federal Repatriation Amount in the denominator. Plaintiff's proffered reasoning is thin and reveals that it simply seeks to replicate the amount of the CFCs' gross receipts as under its first proposal.

- Plaintiff's third proposal, separate accounting, would exclude the 20 Percent Repatriation Amount from the tax base altogether, which the court finds goes too far in the opposite direction, completely ignoring the unitary nature of the overall business enterprise and treating the 20 Percent Repatriation Amount as nonbusiness income or as a dividend from a subsidiary with which the Water's Edge Group lacks either enterprise unity or asset unity.

Turning to Plaintiff's claims for factor relief based on unconstitutionality of the assessment, the court rejects Plaintiff's argument that the assessment violates the requirement, under cases interpreting the Commerce Clause of the United States Constitution, that income be "fairly apportioned" to Oregon, as well as the "nexus," antidiscrimination, and "fairly related"

requirements. Among other conclusions, the court determines that the assessment is not "grossly distortive" because it essentially recaptures--at a lower cost to the taxpayer--income that never would have been deferred in the first place under worldwide combined reporting. As applied to these facts, the court is persuaded by Defendant's analysis applying the so-called "Augusta Formula" [*developed*]{**approved**} by Maine's Supreme Judicial Court. Relatedly, under cases applying the Foreign Commerce Clause, the court finds no "enhanced risk of multiple taxation" in the assessment, given the United States Supreme Court's acceptance of worldwide combined reporting and the lesser burden that the assessment actually imposes on the Water's Edge Group in this case. Finally, Plaintiff's Due Process argument fails for the same reasons that the court finds the assessment not grossly distortive under the Commerce Clause.

## II. LEGAL BACKGROUND

A. *State Law Concepts*

Relevant background on the following subjects can be found in prior cases and the decisions cited there:

- The "unitary business" concept, a creature of state and local tax law, which generally seeks to determine the overall income of an integrated enterprise. This can involve treating a group of entities under common ownership and engaged together in a unitary business as though they were a single entity, "eliminating" intercompany transactions. By contrast, a "separate" accounting system determines each entity's income by measuring its transactions with other entities based on actual or hypothetical "arm's-length" pricing. *See Oracle II,* 24 OTR at 363.

- "Apportionment" of the income of a unitary business by formula, as a way to attribute a percentage of overall income to a particular state. The apportionment formula typically is the ratio of in-state sales to sales everywhere (the sales "factor"), but it may include property, payroll, or other factors. *See id.* at 363-65.[9]

---

[9] Over time, Oregon shifted from using three factors to using only the sales factor. *See* Or Laws 1965, ch 152, §§ 10, 26 (three-factor apportionment method equally weighting sales, property, and payroll factors). The three-factor method applied until 1989, when the legislature adopted a double-weighted sales factor method, applicable to tax years beginning on or after January 1, 1991. *See* Or Laws 1989, ch 1088, §§ 1, 2. A decade later, the legislature again increased the formula's reliance on the sales factor, changing the double-weighted sales factor method to an 80 (sales)/10 (property)/10 (payroll) method. *See* Or Laws 2001, ch 793, § 1. This change applied to

- State tax return and reporting methods, commonly either a "combined report" or a "consolidated return," that reflects the income of multiple entities engaged in the unitary business. *See id.* at 365-66; *ABC Inc. & Combined Affiliates v. Dept. of Rev.*, TC 5431, 2024 WL 2146943 at *17-19 (Or Tax, May 14, 2024). By contrast, some states use a "separate return" method by which each entity files its own return. *See, e.g.*, *Mobil Oil Corp. v. Com'r of Taxes of Vermont*, 445 US 425, 430, 100 S Ct 1223, 63 L Ed 2d 510 (1980).

- "Worldwide" combined or consolidated reporting (in which the income of the unitary business is determined without regard to national borders), as opposed to a "water's-edge" limitation that excludes entities formed under the laws of foreign countries from the group and thus generally excludes the income of foreign entities from the tax base. The federal tax system historically has used consolidated returns for related domestic corporations but has excluded foreign corporations from the consolidated group, thus requiring separate accounting, at arm's-length pricing, to determine a domestic group's income from transactions with its foreign affiliates. *Oracle II*, 24 OTR at 366-68.

- Treatment of dividends as business income or nonbusiness income. *Oracle II*, at 368-74.

As to the issues in this case, the affiliates comprising the Water's-Edge Group, including Plaintiff, generally are a single taxpayer because they have joined together in filing a consolidated Oregon return. *See* ORS 317.710(5)(c); *cf. ABC Inc.* 2024 WL 2146943 at *7-14 (discussing exception to one-taxpayer rule, not relevant for purposes of these cross-motions, in second sentence of ORS 317.715(3)(b)).

B.      *Subpart F*

In *Moore v. United States*, the United States Supreme Court recently summarized the development of the subpart F regime and the 2017 requirement to add the Federal Repatriation Amount to subpart F income:

> "For legal and practical reasons, Congress generally does not directly tax foreign corporations, including American-controlled foreign corporations, on the income that they earn outside of the United States. Instead, Congress has imposed some taxes on income of those corporations on a pass-through basis.

---

tax years beginning on or after May 1, 2003. *Id*. at § 2. Finally, in 2005, the legislature adopted a single-sales-factor method for tax years beginning on or after July 1, 2005. *See* Or Laws 2005, ch 832, §§ 48-48a.

"Most notably, starting in 1962, in what is known as subpart F of the Internal Revenue Code, Congress has treated American-controlled foreign corporations as pass-through entities: Subpart F attributes income of the corporation to American shareholders, and taxes those American shareholders on that income. 26 U. S. C. §§951–952. But subpart F applies only to a small portion of the foreign corporation's income, mostly passive income.

"In 2017, Congress passed and President Trump signed the Tax Cuts and Jobs Act. 131 Stat. 2054. In a variety of ways not relevant to this case, the Act altered the United States' approach to international corporate taxation. The primary goal was to encourage Americans who controlled foreign corporations to invest earnings from their foreign investments back in the United States instead of abroad.

"As relevant here, one piece of that intricate and multifaceted 2017 Act imposed a new, one-time pass-through tax on some American shareholders of American-controlled foreign corporations. That one-time tax addressed one of the problems that had arisen under the old system: For decades before the 2017 Act, American-controlled foreign corporations had earned and accumulated trillions of dollars in income abroad that went almost entirely untaxed by the United States. The foreign corporations themselves were not taxed on their income. And other than subpart F, which applies mostly to passive income, the undistributed income of those foreign corporations was not attributed to American shareholders for the shareholders to be taxed.

"As part of the complicated transition to a more territorial system, the 2017 Act imposed a one-time, backward-looking tax on that accumulated income. That backward-looking tax is known as the Mandatory Repatriation Tax or MRT. §965. Similar in structure to subpart F, the MRT attributed the long-accumulated and undistributed income of American-controlled foreign corporations to American shareholders, and then taxed those American shareholders on their pro rata shares of that long-accumulated income at a rate from 8 to 15.5 percent. §§965(a), (c), (d)."

*Moore*, 219 L Ed 2d at 285-86 (footnote omitted).

The issue in *Moore* was whether the requirement to add the Federal Repatriation Amount to subpart F income was a "tax[ ] on incomes" allowed without apportionment among the states under the Taxing Clause, the Direct Tax Clause, and the Sixteenth Amendment to the United States Constitution. *See Moore*, 219 L Ed 2d at 286; *see generally* US Const, Art I, § 9, cl 4 ("No capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or

Enumeration * * *."); *see also id.,* § 2, cl 3 ("Representatives and direct Taxes shall be apportioned among the several States * * * according to their respective Numbers * * *."); *id.* Amend XVI ("The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."). The taxpayers, American shareholders of a foreign corporation, argued that the requirement did not constitute an "income" tax because, as to them, there had been no "realization" of income when the Amount was merely deemed to have been distributed to them without the transfer of any cash. *Moore*, 219 L Ed at 288 ("And the Moores contend that the [requirement to include the Federal Repatriation Amount in subpart F income] does not tax any income that they have realized."); *see generally* Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 5.2 (discussing concept of realization). The Court rejected the taxpayers' argument, concluding that it was unnecessary to decide whether a realization event is a required component of an income tax, because the CFC *had* realized the income in the course of its business before subpart F caused that income to be "attributed" to the Moores:

> "So the precise and narrow question that the Court addresses today is whether Congress may attribute an entity's realized and undistributed income to the entity's shareholders or partners, and then tax the shareholders or partners on their portions of that income. This Court's longstanding precedents, reflected in and reinforced by Congress's longstanding practice, establish that the answer is yes."

*Moore*, 219 L Ed at 288 (footnote omitted); *see also id.* at 291 n 3 ("Because the MRT taxes realized income--namely, income realized by the corporation and attributed to the shareholders-- we do not address the Government's argument that a gain need not be realized to constitute income under the Constitution.").

More detailed explanation of the integration of the TCJA into the subpart F regime is found in a leading treatise. Joel D. Kuntz & Robert J. Peroni, 1 *US International Taxation* ¶

B3.01 (March 2024). The United States generally taxes domestic US corporations on their worldwide incomes, reducing the possibility of double taxation by allowing a credit for tax paid to foreign countries. *See id.* at ¶ A1.03[1]. However, for tax years starting on or after January 1, 2018, the TCJA created a new deduction that departs significantly from this "worldwide" model and tilts toward a "territorial" model in which federal taxable income is based more on domestic-source income:

> "Added in 2017 by the Tax Cuts and Jobs Act, Section 245A allows a deduction to certain domestic corporations that own stock in certain foreign corporations. The deduction is for the foreign-source portion of a dividend that the domestic corporation receives from the foreign corporation. The intended effect of the deduction, which when applicable covers 100 percent of the foreign-source component, is the exemption of foreign earnings from U.S. taxation."

*Id.* at B6.02A[1] (footnotes omitted). For the last tax year before the new deduction became effective, substantial amendments to Section 965 created the one-time inclusion of the Federal Repatriation Amount that is subject to apportionment in this case:

> "In 2017, Congress completely revised Section 965 as part of major revisions to the U.S. international tax system. Providing a counter-balance to the Section 245A deduction for dividends received from certain foreign corporations, the amended version of Section 965 required, in a one-year transition period, that U.S. shareholders include in their gross incomes certain amounts of income that such corporations had previously earned and accumulated without payment of U.S. tax. To cushion the blow, low rates of tax were imposed on those amounts, and the U.S. shareholders were given years to pay the tax.
>
> "Roughly speaking, the combined effect was to tax the U.S. shareholders, at the favorable rates, as if the tax-deferred earnings had been repatriated as dividends just prior to the adoption of the new international tax regime. Thereafter, actual distributions of the same earnings are not to be taxed."

*Id.* at ¶ B3.04A[1] (footnote omitted). Congress framed the one-time inclusion of Federal Repatriation Amounts as a temporary overlay on the existing system under Section 951. *See* IRC § 965(a) (Subpart F income, as otherwise determined, "shall be increased by" accumulated post-1986 deferred foreign income). For tax years beginning on or after January 1, 2018, Section 951 continues to require annual inclusion of subpart F deemed dividends, like those at issue in *Oracle*

*II.* *See id.* at ¶ A1.06[6] ("In the past, Section 951 has been the section that forces the U.S. shareholders of controlled foreign corporations to include certain amounts in income. Section 951 continues in that role.").

As a provision affecting federal gross and taxable income, the repatriation requirement automatically was incorporated into Oregon law, but CFC shareholders that were themselves corporations holding at least 20 percent of the stock of a CFC benefitted from Oregon's "dividends-received" subtraction, by which they subtracted 80 percent of the Federal Repatriation Amount in computing Oregon taxable income. *See* ORS 317.010(7)(b), (8), (10) (incorporating "taxable income," under federal law as in effect for taxpayer's tax year, as starting point in computing "Oregon taxable income"); ORS 317.070 (imposing tax according to "Oregon taxable income"); ORS 317.267(2)(b) (requiring subtraction, in computing Oregon taxable income, for certain dividends received). Other transitional provisions, including the TCJA rate reduction and the extended deadlines to pay, were not automatically incorporated and thus did not apply for Oregon purposes. *See, e.g.,* ORS 317.061 (setting rates without mention of federal law).

III.    ISSUES

A.  Must a "deemed dividend" constituting the 20 Percent Repatriation Amount be "reincluded" in the definition of "sales" under ORS 314.665(6)(a) if the deemed payor is a CFC engaged in a unitary business with the taxpayer, and if the taxpayer's primary business activity is the same as that of the CFC?

B.  Has Plaintiff carried its burden of proving that the assessment fails to "fairly represent the extent of the taxpayer's business activity in this state" or that the assessment produces "unconstitutional results"?

IV.    FACTS; TABLES SHOWING PARTIES' COMPUTATIONS

Plaintiff is a Washington corporation with its primary place of business in Redmond, Washington. (Stip Facts at 2, ¶ 1.) At relevant times, Plaintiff has operated on a fiscal year

ending June 30, which corresponds to its tax year for federal and Oregon income tax purposes. (*See id.* at 3, ¶ 8.)

Plaintiff and its domestic and foreign subsidiaries (the Worldwide Group) have been, at all relevant times, a unitary group conducting a unitary business that principally develops, manufactures, markets, distributes, sells, licenses, and supports a wide range of software and hardware products, devices, and services. (*Id.* at 2, ¶ 2.) Members of the group consisting of Plaintiff and some or all of its domestic subsidiaries (the Water's-Edge Group) own foreign subsidiaries, including CFCs that license, manufacture, and distribute Microsoft-branded products outside the United States. (*Id.* at 2, ¶ 3.)

Defendant does not assert that any addition to the numerator of the apportionment fraction is necessary in this case. (*See* Statement of Darren Weirnick, Oral Argument, Apr 4, 2023, 2:08 ("The sales of the CFCs * * * those are sales in foreign jurisdictions * * * and I don't think there's any dispute about that.").)

As of TYE 2018, Plaintiff reported in its 10-K that the Worldwide Group employed approximately 131,000 people on a full-time basis. Some 78,000 were in the United States (including 155 in Oregon), and some 53,000 were outside the United States. (*Id.* at 2, ¶¶ 4-5.) The reported domestic and foreign sales of the Worldwide Group were $55,926,000,000 in the United States and $54,434,000,000 from other countries. (*Id.* at 2, ¶ 6.)

As of June 30, 2017, Plaintiff reported in its Form 10-K that $142,000,000,000 of foreign earnings and profits of the foreign subsidiaries in the Worldwide Group were permanently reinvested outside of the United States. (*Id.* at 2-3, ¶ 7.)

After the passage on December 22, 2017, of the TCJA, which among other things amended IRC § 965, Defendant issued Oregon Revenue Bulletin 2018-01. (*Id.* at 3, ¶ 9.) The Bulletin states in part: "[T]he [[*Federal*] {**20 Percent**} Repatriation Amount] {**must**

**be**}[*is*]excluded from the sales factor for tax years beginning [*on or after*]{**before**} January 1, 2018**{, unless the repatriation gross receipts are derived from the taxpayer's primary business activity}**." (Stip Ex 20 at 1.)

In May 2019, the Water's-Edge Group timely filed consolidated federal and Oregon returns for TYE 2018. (*See* Stip Facts at 2-4.)

- The federal return reported a Federal Repatriation Amount under IRC § 965(a) of $159,380,563,499, which included current foreign earnings and profits and those accumulated since the early 2000s. (*See id*. at 3, ¶ 11.)

- The Oregon return reported total taxable business income of $42,350,143,724, which included a 20 Percent Repatriation Amount of $31,876,112,700, after applying the 80-percent dividend received subtraction under ORS 317.267(2). (*See id.* at 3-4, ¶ 13.)

- Consistent with the Bulletin, the Oregon sales factor on the return (0.5318 percent) did not include any receipts attributable to the Federal Repatriation Amount or other subpart F income. (*See id*. at 4, ¶13.)

- The amount of Oregon tax shown on the return was $16,977,966; this was timely paid. (*See id.* at 4, ¶ 13.)

On or about May 20, 2019, shortly after filing its original Oregon return, the Water's-Edge Group filed an amended return for TYE 2018 based on use of alternative apportionment under ORS 314.667. (*See id*. at 4, ¶ 14.) The following "proforma amended return" table is an excerpt from that filing:

//

//

//

//

*Table 1. Amounts of Tax Paid and Refund Claimed on Amended Return*

| | Assessment[10] | Refund Claim[11] | Amended Amounts[12] |
|---|---|---|---|
| Pre Apportioned Income | $42,350,143,724 | | $42,350,143,724 |
| Apportionment | 0.5318% | (0.3432%) | 0.1886% |
| Taxable Income | $225,218,064 | | $79,884,823 |
| Regular Tax | $17,106,573 | ($11,045,326) | $6,061,247 |
| Research Credit | ($128,607) | | $128,607 |
| Net Tax | $16,977,966 | ($11,045,326) | $5,932,640 |

(Stip Ex 24 at 2.) The amended return thus claims a refund of $11,045,326, leaving an undisputed Oregon tax amount of approximately $6 million.[13] (*See id*.) In computing the refund claim, Plaintiff added the Federal Repatriation Amount to the sales factor denominator. (*See* Stip Ex 24 at 1 ("In our petition, we sought to include the foreign dividends in the sales factor.").)

On June 1, 2020, Defendant issued a letter denying the request for refund, and Defendant directed Plaintiff to "[c]onsider this document your Notice of Proposed Refund Adjustment." (Stip Ex 25 at 7.) Defendant acknowledges that Plaintiff timely appealed to the Magistrate Division. (Def's Cross-Mot Summ J & Resp at 9 ("Microsoft timely appealed the department's notice to the Magistrate Division.").) The court specially designated the matter for hearing in the Regular Division at the parties' joint request, and Plaintiff thereafter filed its amended complaint, which Defendant has answered.

Various other administrative proceedings have occurred with respect to TYE 2018, including:

---

[10] Labeled "Original Return" on Stip Ex 24.

[11] Labeled "Difference" on Stip Ex 24.

[12] Labeled "Corrected" on Stip Ex 24.
[13] The court ignores Plaintiff's claim for a research and development credit, as the parties have not discussed that credit in briefing.

- Plaintiff's filing of a pre-return petition for alternative apportionment under ORS 314.667 in January 2019, which Defendant apparently treats as having been amended by the May 20, 2019 refund claim and denied in Defendant's June 1, 2020, letter;

- Defendant's post-return audit of TYE 2018 and other tax years that resulted in a deficiency notice followed by conference proceedings, all culminating in relatively minor adjustments, in November 2021, to the amount at issue for TYE 2018; and

- The filing, in December 2021, of a second amended Oregon return for TYE 2018 based on amendments to the consolidated federal return.

(*See* Stip Facts at 3-7; Stip Ex 25 at 1 (June 1, 2020 letter from Defendant, referring to Plaintiff's "refund claim and amended request for alternative apportionment")); (*see also* Def's Cross-Mot Summ J & Resp at 7 (referring to May 20, 2019, refund claim as "the superseding request for alternative apportionment").) The record suggests that at least some of these proceedings may result in adjustments to the amounts shown on the original return and commensurate adjustments to the amount of refund Plaintiff seeks under its legal theories and proposals for alternative apportionment. *See, e.g.,* footnotes to Tables 2 and 3, below. The court finds that any such adjustments do not, however, raise a genuine issue of material fact that would preclude summary judgment. The court will rule on the parties' cross-motions and will direct the parties to seek resolution of any computational issues, with further proceedings to follow if necessary.

{**For convenience, the court includes additional information regarding the amount of refund in dispute under each of the positions advanced by Plaintiff to be discussed in this Order. At oral argument the parties provided approximations of the amount of the refund that would be due if the 20 Percent Repatriation Amount were included in the sales denominator. Plaintiff estimates that the refund due under reinclusion would be approximately $5,400,000. (Statement of Robert Mitchell, Oral Argument, Apr 4, 2023, at 1:10.) Defendant estimates that the refund would be approximately $4,600,000. (Statement of Darren Weirnick, Oral Argument, Apr 4, 2023, at 1:44.) The difference between the**

**parties appears to turn on resolution of computational issues mentioned in the previous paragraph, which are not material to resolving the issues raised in the parties' cross-motions for summary judgment.**}[*For convenience, the court adds the following table showing the parties' differing computations of the effect of reinclusion of the 20 Percent Repatriation Amount in the denominator of the sales factor pursuant to ORS 314.665(6)(a).*]

*Table 2. Issue A: Parties' Computations of Reduction to Refund Claim if 20 Percent Repatriation Amount is Reincluded under ORS 314.665(6)(a)*

|  | Refund Claim Per Amended Return | Refund Due Under Reinclusion | Remaining Refund Sought |
|---|---|---|---|
| **Plaintiff** | $11,045,326[14] | $5,400,000[15] | $5,645,326 |
| **Defendant** | $11,045,326[16] | $4,600,000[17] | $6,445,326 |

For comparison with the amounts of the assessment, the refund claim, and the refund due under reinclusion, the following table shows the respective amounts Plaintiff argues would be due under its three proposals for alternative apportionment.

---

[14] (Stip Ex 24 at 2.)

[15] (Statement of Robert Mitchell, Oral Argument, Apr 4, 2023, 1:10)

[16] (Stip Ex 24 at 2.)

[17] (Statement of Darren Weirnick, Oral Argument, Apr 4, 2023, 1:44)

*Table 3. Issue B: Plaintiff's Estimates of Refund Due Under Plaintiff's Alternative Apportionment Proposals[18]*

| | **Proposal 1[19]** **Include 20% of CFC Sales in Denominator** | **Proposal 2[20]** **Include 100% of Federal Repatriation Amount in Denominator** | **Proposal 3[21]** **Separate Accounting** |
|---|---|---|---|
| **Amount Added to Denominator** | $106,892,100,683 | $157,052,683,170 | N/A |
| **Apportionment Percentage (0.4924% in Assessment)** | 0.2313% | 0.1852% | N/A |
| **Refund Due** | $9,670,618 | $11,242,112 | $13,268,040 |

## V. ANALYSIS

A.      *Plaintiff's First Theory: Reinclusion of Deemed Dividends Under ORS 314.665(6)(a)*

Plaintiff argues that it is entitled to a portion of the refund it seeks as a matter of statutory construction, not depending on any alleged unfairness or unconstitutionality. Plaintiff's position is that the 20 Percent Repatriation Amount should be reincluded in the denominator of the Oregon sales factor under ORS 314.665(6)(a) as construed in *Oracle II*. Defendant argues that the portion of *Oracle II* on which Plaintiff relies was wrongly decided, and that the Federal Repatriation Amount was derived from holding stock in the CFCs, not from the primary business

---

[18] Defendant has not provided a calculation of the refund due under proposal 1 but has noted a dispute with Plaintiff's calculation. (Statement of Darren Weirnick, Oral Argument, Apr 4, 2023, 1:46). Under proposal 2, Defendant calculates that Plaintiff would be due a refund of $10,961,160. (Def's Cross-Mot Summ J & Resp App C at 78). Under proposal 3, Defendant calculates Plaintiff's refund would be $12,846,530. (*Id.*).

Defendant identifies three independent reasons for the discrepancies between Plaintiff's and Defendant's refund estimates, which apply regardless of the apportionment methodology: "First, Microsoft's sales denominator is incorrect and inconsistent with the parties' stipulation. * * * Second, Microsoft's computation of Oregon tax before credits under each of its proposed alternative methods applies the 7.6-percent tax rate to the Water's Edge Group's entire Oregon taxable income, which fails to take into account that the 6.6-percent tax bracket applies to the first $1M of Oregon taxable income. * * * Third * * * Microsoft's computations neglect to take into account that as a result of the conference decision for TYE 2018 issued in 2021, the department adjusted Microsoft's corporation excise tax for TYE 2018 downwards, as shown in a corrected notice of adjustment of $121,247 for that year." (Def's Cross-Mot Summ J & Resp App C at 76).

[19] (Ptf's Memo Further Supp Mot Summ J App B at 33-34.)

[20] (Ptf's Memo Supp Mot Summ J at 24-25.)

[21] (Ptf's Memo Supp Mot Summ J at 26.)

activity of Plaintiff or the Water's-Edge Group.[22]  (Def's Cross-Mot Summ J & Resp at 16-21.)

The court restates and further explains its reasoning in *Oracle II* and concludes that Plaintiff

prevails on its first theory.

The text of ORS 314.665(6) is the same text that applied to the tax years at issue in

*Oracle II*:[23]

> "(6) For purposes of this section, 'sales':
>
> "(a) Excludes gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, *unless those receipts are derived from the taxpayer's primary business activity.*
>
> "(b) Includes net gain from the sale, exchange or redemption of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income.
>
> "(c) Excludes gross receipts arising from an incidental or occasional sale of a fixed asset or assets used in the regular course of the taxpayer's trade or business if a substantial amount of the gross receipts of the taxpayer arise from an incidental or occasional sale or sales of fixed assets used in the regular course of the taxpayer's trade or business.  Insubstantial amounts of gross receipts arising from incidental or occasional transactions or activities may be excluded from the sales factor unless the exclusion would materially affect the amount of income apportioned to this state."

(Emphasis added.)  Based on the text and context of subsection (a) of ORS 314.665, this court in

*Oracle II* held that deemed dividends under subpart F are eligible to be treated as "derived from

the taxpayer's primary business activity" if the taxpayer is a water's- edge group that is engaged

in a single unitary business with its CFCs.  *Oracle II*, 24 OTR at 386-95 & n 32.

---

[22] Defendant also argues that *Oracle II* is not precedential because the plaintiff in that case dismissed its appeal after the court's order on partial summary judgment but before all issues had been decided.  (Def's Cross-Mot Summ J & Resp at 17 n 18 (citing *State v. Cigtec Tobacco, LLC*, 200 Or App 501, 504, 115 P3d 978 (2005).)  The court in this case does not rely on *Oracle II* as precedent but refers to it only for its persuasive value.

[23] *Oracle II* involved tax years ending May 31, 2010, 2011, and 2012.  *See Oracle II*, 24 OTR at 360 & n 3 (citing 2009 edition of ORS).  The 2017 legislature substantially changed Oregon's apportionment laws, generally replacing the sourcing provisions for sales other than sales of tangible personal property and adopting a market-based approach.  In the process, the legislature eliminated ORS 314.665(6).  However, those changes applied to tax years beginning on or after January 1, 2018, and thus do not apply to TYE 2018.  *See* Or Laws 2017 ch 43, §§ 5, 12; Or Laws 2017 ch 549, §§ 3, 5; Or Laws 2017 ch 622, §§ 3, 5.

1. *Comparison with* Tektronix

Defendant argues in this case that the reasoning in *Oracle II* conflicts with that of the Supreme Court in *Tektronix, Inc. v. Department of Revenue*, 354 Or 531, 316 P3d 276 (2013). (Def's Cross-Mot Summ J & Resp at 15-16). According to Defendant, CFC income is "derived from" the holding of CFC stock, which is not the taxpayer's primary business activity. (*Id*. at 15). The court finds *Tektronix* distinguishable.

In *Tektronix*, the taxpayer, an electronics manufacturer, sold assets constituting its printer division to Xerox Corporation, and a sizeable portion of the sale price was attributable to "goodwill." *See Tektronix, Inc. v. Dept. of Rev.*, 20 OTR 468, 469 (2012), *aff'd on other grounds* 354 Or 531, 316 P3d 276 (2013). The taxpayer took the position that the gain was excluded from "sales" because it "ar[ose] from the sale * * * of intangible assets" under ORS 314.665(6)(a).[24] *See* 354 Or at 542. Defendant assessed a deficiency, contending that that portion must be reincluded because the goodwill

> "was developed by [taxpayer] over many years, in the operation of its Color Printing Division. * * * [T]he Color Printing Division was central to [taxpayer's] primary business of manufacturing and distributing electronics products."

*Id.* at 547 (internal quotations omitted). In response, the taxpayer

> "contend[ed] that, because it did not receive the $590 million from the manufacture and sale of electronics equipment, the $590 million did not 'derive[ ] from the taxpayer's primary business activity.'"

*Id.* The Supreme Court squarely agreed with the taxpayer, rejecting Defendant's position because Defendant had

> "represented to the Tax Court that taxpayer's 'primary business' was 'manufacturing and distributing electronics products.' The sale at issue here was not the sale of such products, but the sale of an entire division of taxpayer's business. The department did not adduce any evidence that taxpayer's primary

---

[24] The positions of the parties in *Tektronix* were the reverse of those in this case. Presumably, the taxpayer in *Tektronix* sought to exclude the gain from the definition of "sales" because some or all of the gain would have been sourced to Oregon and included in the numerator of the sales factor.

business was engaging in the sale of its divisions, and there is no basis for concluding otherwise."

*Id.* at 547-48.

In contrast to the gain in *Tektronix* from the "sale of an entire division," in this case most if not all of the Federal Repatriation Amount demonstrably consists of earnings and profits [*from*]{**the CFCs earned by working together with the Water's-Edge Group to**}sell[*ing*] the same goods and services normally sold in Plaintiff's software business. *See* IRC § 965(a) (Federal Repatriation Amount consists of "accumulated post-1986 deferred foreign income" of CFC); IRC § 965(d)(2) (defining "accumulated post-1986 deferred foreign income" as "CFC's post-1986 earnings and profits," with exceptions). "Earnings and profits" is a term of art in federal income tax law, but its starting point is taxable income. *See* Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 92.1.3. ("Earnings and profits are usually computed starting from taxable income."). There is no dispute that "many of the CFCs in turn engaged in similar 'primary' business activities abroad as the Water's-Edge Group engaged in domestically." (Def's Reply at 3.) And the sales activities of the Water's-Edge Group and the CFCs were not only of the same *type*, they were *part of the same business*. The Water's-Edge Group and the CFCs were actively engaged together in the same single, "unitary business" that generated those earnings and profits. (*See* Stip Facts ¶ 2.) By definition, there was a "sharing or exchange of value" among all of the corporations in the Worldwide Group, as demonstrated by "centralized management," "centralized administrative services" resulting in "economies of scale," or a flow of goods or other resources demonstrating "functional integration." *See* ORS 317.705(3) (1993) (definition of "unitary business"). The only reason those earnings and profits had not already been included in the federal taxable income of the Water's-Edge Group before TYE 2018 was that Congress had not yet required the amounts to be

added to subpart F income, and the directors of the CFCs (presumably elected by members of the Water's-Edge Group) had not chosen to pay out the amounts as dividends.

**{The goodwill in *Tektronix* was a step removed from earnings and profits from sales to customers in the course of the unitary business. This is apparent from the way the two amounts are determined. The Federal Repatriation Amount was determined by adding up many years' worth of undistributed earnings and profits from selling software and services to customers, then attributing that accumulated amount to the Water's-Edge Group. By contrast, the amount of the gross receipts at issue in *Tektronix* was determined solely by whatever Xerox Corporation was willing to pay for an entire package of assets comprising the printer division as a whole. The amount assigned to goodwill in that transaction was *residual*: the "amount paid by [Xerox] in excess of the aggregate fair market value of other assets purchased." 20 OTR at 504 (citing *Webster's Third New International Dictionary* at 979 (2002) (defining "goodwill" as "the excess of the purchase price of a business over and above the value assigned to its net assets exclusive of goodwill"). The amount paid for goodwill, therefore, determined by the circumstances of the one-off sale of Tektronix's printer division, did not necessarily bear any relationship to the amount of prior earnings or profits from engaging in the unitary business.}**

The distinction in this case, then, is that there is no intervening activity, such as the sale in *Tektronix*, that separates the business activities of the CFCs that generated the earnings and profits that became the Federal Repatriation Amount from the business activities of the Water's-Edge Group.[25] The court sees nothing in *Tektronix* that changes the reasoning in *Oracle II.*

    2.    *Reasoning of* Oracle II

---

[25] This is literally true in this particular case, as in *Oracle II*, because subpart F caused the income to be included by operation of law without even the declaration of a dividend.

The court briefly expands on its interpretation of "primary business activity" in *Oracle II*, applying the framework of *State v. Gaines*, 346 Or 160, 171, 206 P 3d 1042 (2009):

- *Text.* The reinclusion clause "does *not* say that the amount must be reincluded if the *sale, exchange, redemption or holding* of the intangibles *constitutes* the taxpayer's primary business activity." *Oracle II*, 24 OTR at 394 (emphases in original). Instead, the text leaves open the possibility that gross receipts may be *derived from* the taxpayer's primary business activity, regardless of whether they arise from the sale, exchange, redemption or holding of intangible assets.

- *Context.*
    - *Administrative rule on "income producing activity."* As of 1995, a longstanding rule of Defendant declared: "The mere holding of intangible personal property is not, of itself, an income producing activity." OAR 150-314.665(3)(2) (1994); *see Oracle II*, 24 OTR at 391-94. The purpose of the rule was relevant: to "determine[ ] whether dividends and other receipts from intangibles or services are assigned to the numerator of the sales factor and thus increase the percentage of income that Oregon may tax." *Oracle II*, 24 OTR at 392 (referring to ORS 314.665(4) (1993)). The legislature is deemed to have been aware of this rule, and that awareness makes it less likely that the legislature intended "primary business *activity*" to include the holding of stock and the receipt of dividends (actual or deemed). *See First EUB Church v. Commission*, 1 OTR 249, 260-61 (1963).[26]

---

[26] **{Defendant argues that another portion of OAR 150-314-0435, renumbered from OAR 150-314.665 in 2016, prohibits inclusion of the 20 Percent Repatriation Amount in the denominator independently of the reinclusion provision in ORS 314.665(6)(a). (Def's Cross-Mot Summ J at 19-20.) In considering this argument, the court first notes that the rule was the subject of considerable analysis in AT&T Corp. v. Dept. of Rev., 357 Or 691, 358 P3d 973 (2015). However, in that case the rule was incorporated as a rule under ORS 314.280, which expressly delegates broad rulemaking authority to Defendant for the apportionment and allocation of income of a "public utility," including one engaged in "the transmission of communications." See id. at 702 & nn 7-9 (referring to former OAR 150-314.665). No such express delegation applies to the rule as applied to non-public utilities that are subject to UDITPA, including Plaintiff in this case. Nonetheless, in this case as in AT&T, neither party contests the validity of the rule; therefore, the court construes it as guidance. See AT&T at 709-10 ("Neither party asserts that the department's rule is invalid or inconsistent with ORS 314.665(4). Accordingly, we now turn to that rule for guidance.").**

**Defendant relies mainly on a sourcing provision and example in OAR 150-314-0435(3)(b) (emphases added):**

**"(b) Where business income from intangible property *cannot readily be attributed to any particular income producing activity of the taxpayer*, the income cannot be assigned to the numerator of the sales factor for any state and must be excluded from the denominator of the sales factor. For example, where business income in the form of dividends received on stock, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities *results from the mere holding of the intangible personal property by the taxpayer*, the dividends and interest must be excluded from the denominator of the sales factor."**

Defendant seems to make two arguments under the rule; the court disagrees with each one. First, one of the rule provisions that Defendant highlights in its briefing is the example in the second sentence quoted above. (*See* Def's Cross-Mot Summ J at 19.) But to the extent that Defendant reads the example to require exclusion per se of dividends that are business income, Defendant's reading is incorrect. The example requires per se exclusion only for business-income dividends that "result[ ] from the mere holding" of the stock. A parent company and its domestic affiliates that are engaged in a single unitary business with foreign subsidiaries that are CFCs do not "mere[ly] hold[ ]" the CFC stock. Instead, by definition, the domestic parent centrally and actively manages the business through its domestic and foreign subsidiaries as one functionally integrated enterprise. *See* ORS 317.705(3) (defining unitary business). Because actual and deemed dividends from unitary CFCs are not automatically excluded from the denominator, they are sourced based on the location of the greater proportion of the costs of performing the income-producing activities that "give[ ] rise to the particular item of income." OAR 150-314-0435(4). This inquiry is factual, and the rule requires the dividends to be excluded only if the income-producing activity that causes them cannot readily be identified.

This brings us to Defendant's second argument: that the 20 Percent Deemed Repatriation Amount cannot readily be attributed to a particular income-producing activity of the Water's-Edge Group. (*See* Def's Cross-Mot Summ J at 19-20.) The problem with this argument is that Defendant has not made a *prima facie* case. For starters, Defendant has not attempted to identify the kinds of activities that "give rise" to a dividend that is not only business income but business income from a unitary subsidiary. Citing *Tektronix*, Defendant provides only the conclusory statement that "[t]he deemed distribution of the accumulated of earnings and profits of CFCs, particularly over nearly two decades is, like goodwill, the product of many activities over many years, unlike the provision of a particular service to a customer." (Def's Cross-Mot Summ J at 19.) The court believes that even the "readily * * * attributed" standard in the rule requires a deeper inquiry. For example, cogent arguments could be made that the court should focus on one or both of the following:

- Activities of the Water's-Edge Group as shareholders, affecting whether or when the CFCs would pay dividends, or be deemed to pay them. For example, as majority shareholders of the CFCs, members of the Water's-Edge Group, acting through employees or board members whose compensation costs were borne by the Water's-Edge Group, could have used their voting power to control or influence decisions of the CFCs to either *declare* actual dividends that would be immediately subject to United States federal and state tax in tax years before the TCJA, or to *refrain from declaring* dividends such that earnings and profits would build up and be included in the Deemed Repatriation Amount. A focus on this first type of activity would harmonize the rule's requirement that the income-producing activity "give rise" to the dividend or deemed dividend with the court's reasoning in *Oracle II* that gross receipts under Section 965 "arise from" dividends or deemed dividends. *See Oracle II*, 24 OTR at 386-88; *Tektronix*, 354 Or 531.

- The second alternative type of activity consists of the activities of the Water's-Edge Group that assisted in generating the CFCs' earnings and profits. Defendant argues that "[o]ne may not conflate the activity of the CFCs with the activity of the taxpayer, the Water's-Edge Group, under ORS 314.665(4)." (Def's Cross-Mot Summ J at 20.) That statement is true in the abstract, but it again ignores the fact that the Water's-Edge Group and the CFCs were engaged together in the same "unitary business," which necessarily means that their activities were centralized and integrated. *See* ORS 317.705(3) (defining unitary business). For example, supervision of enterprise-wide business functions such as developing or updating products, branding, and marketing might be readily identifiable, and the associated costs of performance might be traceable and attributable to particular locations.

The record before the court does not make a *prima facie* showing that activities of either type cannot be readily identified, or that the court should consider some other type of activity. What the record does show is

**that 45,276 of Plaintiff's full-time-equivalent employees in TYE 2018 were located in the state of Washington, compared to 78,000 in the United States and 131,000 worldwide. (Def's Decl of Kelley at 1, ¶ 2; Stip Facts at 2, ¶ 4.) Washington also was the state of Plaintiff's primary place of business (Stip Facts at 2, ¶ 1) and of its commercial domicile (Ptf's Mot Summ J at 2; Def's Cross-Mot Summ J at 2.) Defendant itself, in its briefing on Plaintiff's motion for reconsideration, seems to assume that, whatever the relevant activities were, they happened in Washington. (*See* Def's Resp Recons at 3 ("if the income-producing activity that produced the 20 Percent Repatriation [Amount] is the activity of a member of the affiliated group in some water's-edge jurisdiction, that activity would be attributed to only one state--here, the headquarters state from which Microsoft oversees or manages the CFCs.").) Thus, without opining on the level of deference to be afforded to the rule as applied to a UDITPA taxpayer, or on the overall validity of the "throw-out" provision in the rule, the court rejects Defendant's argument that application of the rule to the facts of this case requires the 20 Percent Repatriation Amount to be excluded from the denominator.**

**Separately from the rule, Defendant contends that including the 20 Percent Repatriation Amount in the sales factor denominator is inherently unconstitutionally distortive if the entire 20 Percent Repatriation Amount is then included in the numerator for any one state. (*See, e.g.,* Def's Cross-Mot Summ J at 23-24 ("the sudden recognition in the sales factor in a single year of decades of deferred earnings and profits would not be representative of the taxpayer's ordinary business activity in TYE 2018 * * * .").) The court rejects this contention, again because the great majority of Water's-Edge Group employees were located in Washington and because the nature of those employees' work apparently was such that Plaintiff's "commercial domicile" was in Washington. On that record, the court cannot rule that sourcing the 20 Percent Repatriation Amount to Washington inherently fails to "actually reflect a reasonable sense of how [the 20 Percent Repatriation Amount] is generated." *Container Corp.*, 463 US at 169.}**

[*Defendant argues that other portions of the rule prohibit reinclusion of the gross receipts in this case. (Def's Cross-Mot Summ J at 19.) First, Defendant claims that the activities that gave rise to the CFCs' earnings and profits were not "directly engaged in by the taxpayer" as required by OAR 150-314.665(2)-(B)(2) (1995). This argument fails for the reason explained above: under the definition of a "unitary business," Plaintiff and the Water's-Edge Group were inextricably involved in the same business as the CFCs.*

*Second, according to Defendant, the receipts in this case "cannot readily be attributed to any particular income producing activity of the taxpayer" and must therefore be excluded from both the numerator and the denominator of the sales factor under OAR 150-314.665(3)(b). The court rejects this argument for the same reason: as to most of the CFCs, if not all of them, the income producing activities were the same as those engaged in by the Water's-Edge Group. The example in the second sentence of subsection (3)(b) makes it clear that the inability to readily attribute income to an activity arises when the income "results from the mere holding of the intangible personal property by the taxpayer," as would occur, for example, when the taxpayer owns a minority interest in the stock and is not engaged in a unitary business with the subsidiary.*

*On a similar note, Defendant seeks to equate the CFCs' accumulated earnings and profits in this case with the goodwill in Tektronix which, this court stated, "reflected an accumulation of value over periods of time * * * ." Tektronix, 20 OTR at 471. (Def's Cross-Mot Summ J & Resp at 20.) This court concluded that the gain in Tektronix was not readily attributable to a particular income-producing activity under the rule, and Defendant seeks the same result here. However, Defendant compares apples to oranges. The Federal Repatriation Amount consists of the CFCs' accumulated "earnings and profits." Federal tax accounting rules require the earnings and profits of a corporation to be determined with substantial precision and tracked over time, because a distribution to shareholders--whenever it might happen--constitutes dividend income only to the extent that the corporation makes the distribution "out of its earnings and profits." IRC § 316(a); see Bittker & Lokken ¶ 92.1.3 ("Because there is no statute of limitations on the effect of prior transactions on accumulated earnings and profits, permanent retention of corporate records is advisable.") (footnote omitted). The record in this case suggests that Plaintiff was readily able to make those calculations, thus attributing the 20 Percent Repatriation Amount to the activities of the CFCs in the course of their trade or business, which they engaged in together with the Water's-Edge Group. By contrast, the amount of gross receipts at issue in Tektronix was determined solely by whatever Xerox Corporation was willing to pay for the intangibles at issue. To the extent that the intangibles were goodwill, their value was the residual "amount paid by [the] purchaser in excess of the aggregate fair market value of other assets purchased." 24 OTR*

o *Mobil.* Some 15 years before the 1995 legislative session, the United States Supreme Court relied on the unitary nature of a business conducted by a domestic parent corporation and its overseas subsidiaries in allowing Vermont to tax an apportioned share of dividends from those subsidiaries. *Mobil Oil Corp. v. Commissioner of Taxes*, 445 US 425, 100 S Ct 1223, 63 L Ed 2d 510 (1980). At the time, Vermont law did not allow the parent corporation to file a combined report or a consolidated return with its subsidiaries; therefore, dividends to the parent were not "eliminated" as intercompany transactions. *See Mobil*, 445 US at 441 n 15. The taxpayer sought to treat the dividends as nonapportionable nonbusiness income allocated outside Vermont. *See Mobil*, 445 US at 430. However, the Court held that the dividends were business income to the extent received from affiliates engaged in a unitary business with the taxpayer:

> "So long as dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business. One must look principally at the underlying activity, not the form of investment, to determine the propriety of apportionability.

> "Superficially, intercorporate division might appear to be a more attractive basis for limiting apportionability. But the form of business organization may have nothing to do with the underlying unity or diversity of business enterprise. Had appellant chosen to operate its foreign subsidiaries as separate divisions of a legally as well as a functionally integrated enterprise, there is little doubt that the income derived from those divisions would meet due process requirements for apportionability."

*Id.* at 440-41. The Oregon Legislature would have understood from *Mobil* that it is the "underlying activity" that determines whether dividends are apportionable at all, and that when the parent and subsidiary share the *same* activities because they engage together in the same unitary business, the dividends are apportionable.[27] The court sees no reason why the legislature would have deviated from that understanding when it used the term "primary business

---

*at 504. That value did not necessarily bear any relationship to the amount of prior earnings or income, so it is unsurprising that the gross receipts from the sale of the intangibles in Tektronix could not be readily attributed to a particular business activity.*]

[27] The court expresses no view as to whether it would reach the same conclusion if Plaintiff and the CFCs were not engaged in a single unitary business. The court also takes this opportunity to correct a mislabeling in *Oracle II*: scholars sometimes describe entities engaged together in a single unitary business as having "enterprise unity." *See, e.g.,* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation: Third Edition* ¶ 8.08[2][b][i] 6-7 (Jul 2024). In *Oracle II*, the court incorrectly described that kind of relationship (present in *Mobil,* in *Oracle II*, and in this case) as "asset unity." *Oracle II*, 24 OTR at 395 n 38; *see Comcast*; Hellerstein *et al., State Taxation* at ¶ 8.08.

activity" to determine whether dividends *from a unitary subsidiary* are reincluded as gross receipts.[28]

- *Legislative history.* As the Supreme Court explained in *Tektronix*, the legislature adopted ORS 314.665(6)(a) as a "broader solution" to the relatively discrete "'treasury function' problem," referring to the sourcing of gross receipts from stock or other intangibles that are "short-term liquid assets that a corporation use[s] to store cash for business purposes." *Tektronix*, 354 Or at 545. Subpart F income plainly is not part of the treasury function problem, because there is no evidence that Plaintiff held the CFCs as short-term vessels to store cash. But there also is no discussion in the legislative history to suggest that subpart F income is within the scope of the broader solution.

As in *Oracle II*, the court concludes that, in the case of a multicorporate unitary business, the 1995 Oregon Legislative Assembly ("legislature") intended "primary business activity" to be determined by reference to "underlying activities" (in this case, developing, manufacturing, marketing, distributing, selling, licensing, and supporting a wide range of software and hardware products, devices, and services), not to "[s]uperficial[ ]" activities related only to "intercorporate

---

[28] Defendant argues that this conclusion "would disregard the separate personhood of the foreign corporations and the legislature's deliberate decision in the 1984 special session to end Oregon's use of worldwide combined reporting effective in 1986 and to move to a water's-edge method based on the federal consolidated return filed by domestic corporations included in a federal affiliated group." (Def's Cross-Mot Summ J & Resp at 14-15.) The court disagrees with both points.

First, simply acknowledging the fact that Water's Edge Group members, as majority shareholders of the CFCs, no doubt can often influence the CFCs' directors they appoint to declare dividends, or to refrain from doing so in a manner that causes CFC earnings and profits to build up over time without taxation, does not disregard the separate existence of the CFCs. *See Moline Prop., Inc., v. Com'r of Internal Rev.*, 319 US 436, 439, 63 S Ct 1132, 87 L Ed 1499 (1943) (stating "* * * so long as th[e] purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity").

Second, the line drawn by the 1984 legislature is analogous to that in *Mobil*: both Oregon's water's-edge system and Vermont's separate-return system require dividends to be recognized as income, rather than eliminated as intercompany items. Yet in determining how to treat such dividends for apportionment purposes, the court in *Mobil* looked beyond Vermont's line to the unitary nature of the business conducted by affiliates on both sides of the line. Moreover, the Court's recent decision in *Moore* similarly reaches beyond the domestic-foreign divide by concluding that a *CFC*'s realization of income in the course of the *CFC's* business suffices to satisfy any requirement that income be "realized" in order for the inclusion of the Federal Repatriation Amount in subpart F income to survive scrutiny as an "income" tax under the Taxing Clause, the Direct Tax Clause, and the Sixteenth Amendment to the United States Constitution. *See Moore*, 219 L Ed 2d at 288 (inclusion of Federal Repatriation Amount in subpart F "*does* tax realized income--namely, income realized by the [CFC].") (emphasis in original); *id.* at 291 n 3 ("The Government argues that a gain does not need to be realized to constitute income under the Constitution. * * * Because the [inclusion of the Federal Repatriation Amount as subpart F income] taxes realized income--namely, income realized by the corporation and attributed to the shareholders--we do not address the Government's argument that a gain need not be realized to constitute income under the Constitution.").

division," such as forming subsidiaries and holding their stock.  (Stip Facts at ¶ 2.)  *Mobil*, 445

US at 440.  Therefore, Plaintiff prevails as to its first theory, to the following extent:

> "The two things that must be compared under the reinclusion provision are, therefore, (1) the primary business activity of the subsidiary that generated the earnings and profits * * * to which any subpart F income is attributable * * * and (2) the primary business activity of the parent. If these are the same, then the dividend must be reincluded in the definition of 'sales' because the * * * subpart F income * * * is 'derived from' the taxpayer parent's 'primary business activity.'"

*Oracle II*, 24 OTR at 395.[29]

B.      *Plaintiff's Second Theory: Factor Representation*

The court's conclusion in Plaintiff's favor on the reinclusion issue does not result in a

refund of the full amount Plaintiff claims.  *See* Table 2, Part IV, above.  As its second theory,

Plaintiff argues that, regardless of whether it prevails under its first theory, it is entitled to deviate

from Oregon's statutory apportionment formula under the "safety valve" statute in Oregon's

UDITPA (ORS 314.667).  (Ptf's Memo Further Supp Mot Summ J at 10 ("If DOR is wrong, and

the statute is read to authorize representation of the deemed dividend in the sales factor, the

constitutional issues that this case raises can be *ameliorated (though not fully resolved)*.")

(emphasis added).)[30]  Commenters and practitioners commonly refer to Plaintiff's position as a

request for "factor representation" or "factor relief," which relies on a principle of correlation:

---

[29] Defendant "does not dispute that most of the CFCs appear to have been principally engaged in some aspect of developing, manufacturing, marketing, distributing, selling, licensing, or supporting software and hardware products, devices, and services and that a substantial portion of those CFCs' own earnings and profits were from such activities."  (Def's Cross-Mot Summ J & Resp at 14 n 15.)  However, Defendant points to evidence that "some CFCs clearly engaged primarily in classic treasury management or investment trading activities, which the 1995 legislature plainly intended to exclude from 'sales' under ORS 314.665(6)(a)."  (*Id.*)  Plaintiff appears to contest the latter point.  (*See* Ptf's Memo Further Supp Mot Summ J at 17.)  Based on the wording of Defendant's argument, including its characterization of the issue as a "computational matter," the court will allow the parties to seek to resolve this point in proceedings following this order; if they are unable to do so, the court will treat its order as one for partial summary judgment.  (*Id.*)  *See* TCR 47 C.

[30] As Plaintiff explained at oral argument, the reinclusion clause increases the sales factor denominator only by the amount of the CFCs' deferred earnings and profits, which are calculated *net* of the CFCs' expenses; the CFCs' sales are their *gross* receipts.  (Statement of Robert Mitchell, Oral Argument, Apr 4, 2023, 1:09; *see also* Ptf's Memo Further Supp Mot Summ J at 4.)

that an addition of income to the tax base should be accompanied by additions to the

denominator of the apportionment fraction. *See generally* Hellerstein *et al., State Taxation* at ¶

9.15[2] ("In short, a state should not be able to have it both ways: including income of

subsidiaries in the parent's apportionable tax base on the theory that the parent and the subsidiary

are engaged in a unitary business but then apportioning such income by factors reflecting only

the parent's own operations on a separate-company basis."); *see generally, id.* at 9.20[8][i]

(discussing statutory factor representation cases); *id.* at 9.15[2][a] (specifically discussing

inclusion of unitary subsidiary's factors when apportioning parent's dividend income).

Relief is available under ORS 314.667 for either of two reasons. First, the statute

expressly may be invoked when the formula in UDITPA does not "fairly represent" the extent of

the taxpayer's business activity in Oregon. ORS 314.667(1). Alternatively, the statute has been

construed as a mechanism "to remedy unconstitutional results." *Twentieth Century-Fox v. Dept.

of Revenue*, 299 Or 220, 228, 700 P2d 1035 (1985). Applying Oregon's first-things-first

doctrine, the court begins with Plaintiff's argument under the statutory "fairly represent"

standard.[31]  *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is

---

[31] Plaintiff implies that relief also requires that the case be "unusual," even though nothing in the statute expressly says so. (*See, e.g.,* Ptf's Memo Further Supp Mot Summ J at 25; Ptf's Memo Mot Summ J at 19-20 (quoting *Twentieth Century-Fox*, 299 Or at 228 (statute applies "in unusual cases" where UDITPA formula does not fairly represent taxpayer's business activity).) This court reads *Twentieth Century-Fox*, as well as statements of the UDITPA framers when taken in their greater context, as expressing an expectation that the standard formulas under UDITPA will *likely* yield a fair result in most cases, not as prescribing an additional element of "unusualness" that is either necessary or sufficient to obtain relief under a "safety valve" statute. *See Twentieth Century-Fox*, 299 Or at 224 (three-factor apportionment "typically" produces fair taxation although it is not "100 percent accurate for each taxpayer or taxing jurisdiction")*, see, e.g.,* William J. Pierce, *The Uniform Division of Income for State Tax Purposes,*" 35 Taxes 747, 780-81 (Oct 1957) ("This section necessarily must be used where the statute reaches arbitrary or unreasonable results so that its application could be attacked successfully on constitutional grounds. Furthermore, it gives both the tax collection agency and the taxpayer some latitude for showing that for the particular business activity, some more equitable method of allocation and apportionment could be achieved. Of course, departures from the basic formula should be avoided except where reasonableness requires. Nonetheless, some alternative method must be available to handle the constitutional problem *as well as the unusual cases*, because no statutory pattern could ever resolve satisfactorily the problems for the multitude of taxpayers with individual business characteristics.") (emphasis added). Defendant's administrative rules, in accordance with regulations of the Multistate Tax Commission, previously included an "unusual case" requirement, but these requirements were removed in 1999 and 2010, respectively. *See* OAR 150-314.670 (1997) ("ORS 314.670 may be

to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim.").

1. *Relief Under Statutory "Fairly Represent" Standard*

The relevant portion of the "safety valve" statute is materially the same as when the legislature enacted it in 1965 as part of UDITPA:

"(1) If the application of the allocation and apportionment provisions of ORS 314.605 to 314.675 do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for and the Department of Revenue may permit, or the department may require, in respect to all or any part of the taxpayer's business activity:

"(a) Separate accounting;

"(b) The exclusion of any one or more of the factors;

"(c) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

"(d) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

"(2) The department may adopt rules to promote uniformity and consistency with other states in the application of the Uniform Division of Income for Tax Purposes Act."

ORS 314.667.[32]

a. *Twentieth Century-Fox* and later cases

---

invoked only where unusual fact situations (which ordinarily will be unique and nonrecurring) produce results which violate a taxpayer's rights under the constitution of Oregon or of the United States."); note, OAR 150-314.670 (1999) ("Repealed 12/31/99"); Hellerstein *et al, State Taxation* at ¶9.20[4][c] ("In 2010, the MTC revised this regulation to eliminate the [unusual case] language[.]"). The court is satisfied that there is no requirement to find an "unusual case" before applying ORS 314.667. Accordingly, Plaintiff is neither helped nor harmed by the undisputed fact that the TCJA's requirement to repatriate up to 31 years' worth of deferred CFC earnings and profits was a one-time event that marked a substantial shift in US international tax policy. That law change was an unusual event, but that fact does not help to resolve whether Oregon's statutory apportionment system fails to "fairly represent" the extent of the Water's Edge Group's business activity in Oregon or produces unconstitutional results.

[32] *See* Or Laws 1965, ch 152, § 19; Or Laws 1984, ch 1, § 17 (Special Session) (adding requirement of constitutional violation as condition to petition right); Or Laws 1999, ch 144, § 9 (deleting text added in 1984 and adding rulemaking authority in subsection (2)). *Twentieth Century-Fox* involved pre-1984 tax years and thus text materially identical to ORS 314.667(1). *See* 299 Or at 222 (tax years 1975-77).

As the party advocating for an alternative apportionment method under ORS 314.667, Plaintiff must prove two things. *See Donald M. Drake Co. v. Dept. of Rev.*, 263 Or 26, 32, 500 P2d 1041 (1972) ("[T]he * ** party--the taxpayer or the Department of Revenue--who seeks to invoke the applicability of ORS [314.667] has the burden of proof."). First, "that the statutory formula as a whole does not 'fairly represent the extent of the taxpayer's business activity in this state.'" *Twentieth Century-Fox*, 299 Or at 233 (quoting what is now ORS 314.667(1)). Second, that "the alternative method of allocating income is 'reasonable.'" *Id*.

The court in *Twentieth Century-Fox* did not define the boundaries of the "fairly represent" requirement in the abstract, except to state that the standard is not identical with constitutional standards. *See id.* at 228. However, the steps the court took are instructive.

- First, the court sought to accurately define the taxpayer's business activity in Oregon as "the licensing *of motion pictures*" for exhibition by independent theaters (Defendant's position), as opposed to the distribution of copies of prints made from negatives stored in California (the taxpayer's position):

  > "It would be inaccurate to describe taxpayer's business activity as distributing *reels of prints* without reference to the negatives from which they are made. Without the negative, the distribution prints could not be made. The business activity of taxpayer in Oregon is the *distribution for display of the embodiment of a story or theme, photographed, edited, acted and captured on film*."

  *Id*. at 222, 234 (emphasis added).

- Second, the court examined whether the property factor under the standard formula matched this broad definition of the activity.[33] The court found a flaw: by valuing only the tangible personal property that physically entered Oregon, the formula created "an artificial distinction between prints and negatives." *Id.* at 237. Based on the parties' stipulations, admitted allegations, and uncontested testimony, the value of the reels of prints that the taxpayer distributed ($800 to $1,000 per reel) was "woefully inadequate" as a means to capture the full extent of the taxpayer's business activity because the entire, multi-million-dollar cost to produce the motion picture was assigned to the negatives, which never left the

---

[33] The court focused on the property factor because the evidence showed that the payroll factor was zero and the sales factor was accurate; therefore, any inaccuracy could reside only in the property factor. *Id.* at 234-35.

state of production and thus could not be included in the property factor numerator. *Id.* at 234 n 8 (sources of evidence); *id.* at 236 (inadequacy of standard property factor).

After its in-depth comparison of the taxpayer's actual activities to the kinds of activities captured by the apportionment factors, the court went on to uphold as "reasonable" Defendant's proffered alternative apportionment method. This alternative method redefined the numerator of the property factor to have two values, not one: (1) the total value of the taxpayer's films in release, multiplied by (2) the ratio of Oregon receipts to total receipts. The alternative method made no change to the denominator (real and tangible personal property everywhere). *Id.* at 236. The court announced the following test:

> "[I]n the context of UDITPA, reasonableness has at least three components: (1) the division of income fairly represents business activity and if applied uniformly would result in taxation of no more or no less than 100 percent of taxpayer's income; (2) the division of income does not create or foster lack of uniformity among UDITPA jurisdictions; and (3) the division of income reflects the economic reality of the business activity engaged in by the taxpayer in Oregon."

*Id*. at 233-34 (emphasis in original). On the facts of the case, there was substantial overlap between the "fairly represents" part of component (1) and the "economic reality" requirement of component (3).[34] By applying the alternative formula, the court concluded that the taxpayer owed approximately $22,000 more in tax than under the standard formula. *Id.* at 225 n 3.[35]

---

[34] The court treated the two parts of component (1) separately, concluding first that Defendant's alternative method did not result in more than 100 percent of the taxpayer's income being taxed, and second that the method "fairly represent[ed]" the taxpayer's business activity in Oregon in that it "accurately reflect[ed] the cost or value of films owned by taxpayer and distributed for display in Oregon." *Id.* at 236-37. As to component (2), the court concluded that the method fostered uniformity by conforming to the formula developed by a major film-producing state. And as to component (3), the court concluded that Defendant's method "reflects the economic reality of the distribution of motion pictures by taxpayer by discarding an artificial distinction between prints and negatives and attributing to a film the costs of production, which more accurately reflects the business activities of the taxpayer." *Id.* at 237.

[35] This court observes that, by introducing into the numerator of the property factor the same inputs (gross receipts) that make up the sales factor, the modification achieved a result much like an extra "weighting" of the sales factor, which the legislature later adopted over time until it eventually phased out the property and payroll factors altogether. *See* Or Laws 2005, ch 832, §§ 48-48a (adopting a single-sales-factor method for tax years beginning on or after July 1, 2005). Thus, arithmetically, the flaw that the court identified in *Twentieth Century-Fox* could be

i. *Crocker Equipment Leasing* and *Pacific Coca-Cola*

Similarly to *Twentieth Century-Fox*, the court allowed alternative apportionment in *Crocker Equip. Leasing, Inc. v. Dept. of Rev.*, 314 Or 122, 838 P2d 552 (1992).[36] Notwithstanding the taxpayer's name, it was a wholly owned subsidiary of a bank with which it was engaged in a unitary "financial organization" business. *See id.* at 124-25, 128. The taxpayer showed that some 97 percent to 98 percent of its income-producing assets were intangibles, such as loans and equipment leases that represented "an alternative form of financing." *Id.* at 129 & n 4. However, the standard UDITPA formula, which was incorporated into the administrative rule governing financial organizations, included only real or tangible personal property in the property factor. Applying the equally weighted three-factor apportionment formula still in place at that time, the court found that excluding intangibles from the property factor "grossly distorted" the taxpayer's Oregon income. *Id.* at 132 (internal quotations omitted). This distortion was not corrected by the gross revenue factor because the concept of equal weighting relied on a "built-in assumption that one-third of the net income is derived from the use of property, one-third from services and one-third from selling." *Id.* at 132 (internal quotations omitted). The court accepted the taxpayer's proffered alternative to include intangibles in the property factor. *See id.* at 132-34. As in *Twentieth Century-Fox*, there was substantial overlap between the "fairly represents" part of component (1) and the "economic

---

described either (a) in the court's terms, as an over-weighting of a standard property factor that ignored the real source of most of the property value (an acted and edited story that the court treated as residing in the negatives), or (b) as an under-weighting of the sales factor, which the court believed more accurately captured the relative share of the value of the story delivered to the Oregon market.

[36] In *Crocker*, the taxpayer was a financial organization excluded from UDITPA under ORS 314.615 (1992), but the court applied the substance of the "fairly represent" test under 314.667 because Defendant's rules for financial organizations incorporated that test verbatim. *See id.* at 130. As in *Twentieth Century-Fox*, the tax years at issue preceded the 1984 amendments to ORS 314.667; the "fairly represent" test imported into Defendant's rule did not require the taxpayer to show that the standard apportionment method was unconstitutional. *See id.* at 125 (tax years 1978-80).

reality" test in component (3): in both instances, the court relied on the taxpayer's uncontested expert testimony that excluding intangibles from the property factor "does not reasonably reflect how the income is generated for a bank" because a bank generates most of its income from intangibles. *Id.* at 131-32, 133-34.

In contrast to *Twentieth Century-Fox* and *Crocker*, the court in *Pacific Coca-Cola Bottling v. Dept. of Rev.*, 307 Or 667, 773 P2d 1290 (1989) found no flaw in the standard apportionment factor. The taxpayer, seeking alternative apportionment, pointed out that its most valuable asset was its intangible trademark, which the taxpayer seemed to suggest had a taxable situs at the taxpayer's Georgia headquarters. *See id.* at 672.[37] However, the taxpayer presented "[n]o reasoned argument" to show that this fact caused the statutory formula to be unfair. *Id.* Furthermore, the parties had chosen to "bifurcate[e]" the case at trial, meaning that they stopped short of asking this court to decide on any specific alternative formula, a forgone process that the Supreme Court suggested would have shed light on whether the standard formula satisfied the "fairly represent" requirement. *Id.* The court concluded that the trademark "helps create the sales income" in Oregon; therefore, the taxpayer had not proved that the value of the trademark was inadequately reflected in the sales factor or in the formula as a whole. *Id.* at 672.

    ii.  Test under *Twentieth Century-Fox*, *Crocker*, and *Pacific Coca-Cola*

None of these decisions states a bright-line test along the lines that inclusion of a particular item in income must be accompanied by a change in the apportionment factor or factors. However, the basic principle of correlation that underlies factor representation does seem to find support in the court's conclusions in *Twentieth Century-Fox* and *Crocker* that the glaring omission of a highly valuable income-producing intangible from the property factor

---

[37] The tax years at issue were 1967 through 1974. *See id.* at 668.

violates the "fairly represent" requirement. This court concludes that the clear absence of a correlation in a particular case requires further examination, because it may indicate an inaccuracy that violates the "fairly represent" requirement. The Supreme Court's emphasis on accuracy requires a close examination of the nature of the taxpayer's business activities and a determination whether the apportionment formula inaccurately ignores, or over- or underweights, a substantial feature of the activities. This accuracy analysis, like the analysis of any proffered alternative methods, must be based on the "economic reality" of the taxpayer's activities, "discarding" artificialities such as rigid criteria for assigning property value to tangible vs. intangible property or to property located within vs. without Oregon.

  b.      Further review under *State v. Gaines*

In applying the "fairly represent" requirement under the above decisions, the court is mindful of important differences in this case. First, all of the decided cases involve only domestic commerce. Therefore, Oregon's dramatic shift in 1984 from a worldwide tax base to a water's-edge system is not discussed. Second, all of the cases involve alleged inadequacies in the former three-factor apportionment formula, where it was necessary (and possible) to satisfy the "fairly represent" standard by rebalancing the relative weight among the three factors (as in *Twentieth Century-Fox*) or by changing the composition of the property factor (as in all three cases). By contrast, this case involves tax years in which the sales factor either was the sole factor or (when taking the early years of the deferral period into account) was at least double-weighted in relation to the other factors. Plaintiff does not seek to add a different factor, but only to increase the denominator of the sales factor, in order to represent, or correlate to, the addition of substantial income from the Twenty Percent Repatriation Amount.[38] Because of these

_____

[38] As discussed below, Plaintiff's third alternative proposal, for "separate accounting," essentially would exclude the 20 Percent Oregon Repatriation Amount from income. (*See* Ptf's Memo Supp Mot Summ J at 26). This third proposal is likewise focused on sales-factor apportionment and does not involve changing the sales factor or

differences, the court seeks further guidance by applying the framework of *State v. Gaines,* first to the "safety valve" statute (ORS 314.667), and then to the relevant provision of the water's-edge statutes (ORS 317.267(2)). 346 Or 160.

     i. Text and context of ORS 314.667

The court has sought, with little success, to find additional guidance by reviewing the text and context of ORS 314.667 for any insights specifically relevant to the facts of this case.[39] The plain meaning of "represent" confirms to the court that the legislature intended to have an arithmetic formula stand in for, or take the place of, the taxpayer's business activity. *Webster's Third New Int'l Dictionary* 1926 (unabridged ed 1961)("to serve as a sign or symbol of" and "to present by means of something standing in the place of").[40] To do so "fairly" most likely meant

---

adding a different factor; it is the arithmetic equivalent of nominally apportioning the Federal Repatriation Amount and then applying an Oregon sales factor of zero.

   [39] The court has found no legislative history on point, as it appears that neither the UDITPA framers nor the 1965 Oregon legislature discussed combined reporting or consolidated returns to any significant extent.

   [40] The full definitions provided:

"1: to bring clearly before the mind : cause to be known, felt, or apprehended : present esp. by description
"2: to serve as a sign or symbol of
"3: to portray by pictorial, plastic, or musical art : DELINEATE, DEPICT
"4 *archaic* : to make manifest : DISPLAY, EXHIBIT, SHOW
"5: to exhibit by delineation, depiction, or portrayal —used esp. of a work of art
"6: to present by means of something standing in the place of : serve as the counterpart or image of : TYPIFY
"7: to exhibit dramatically:
"a: to produce on the stage
"b: to act the part or role of : personate in acting or on the stage
"8a: to supply the place, perform the duties, exercise the rights, or receive the share of : take the place of in some respect : fill the place of for some purpose : substitute in some capacity for : act the part of, in the place of, or for (as another person) usu. by legal right
"b: to serve (as in a legislative body) by delegated or deputed authority usu. resulting from election<the state was ~*ed* in Congress by two Republicans>
"9: to describe as having a specified character or quality
"10: to set forth or place before someone (as by statement, account, or discourse) : exhibit (a fact) to another mind in language : give one's own impressions and judgment of : state with advocacy or with the design of affecting action or judgment : point out by way of protest or remonstrance
"11: to serve as a specimen, example, or instance of
"12a: to form an image or representation of in the mind
"b(1) : to apprehend (an object) by means of an idea
"(2) : to recall in memory (an object of previous experience)
"13: to correspond to in kind ~*vi* : to make representations against something : present objections : protest"

to make an impartial, unbiased effort to select a formula that was based in evidence and reason. *Webster's Third New Int'l Dictionary* 816 (unabridged ed 1961).[41]  The court finds these definitions insufficiently specific to enable the court to decide whether the Water's-Edge Group's unadjusted apportionment factor for TYE 2018 "fairly represent" the extent of the group's business activities in Oregon when the 20 Percent Repatriation Amount is added to income.

---

[41] Several senses of "fairly" conveyed a range of degrees of accuracy, from merely "tolerably," "moderately," and "rather" to "clearly," "definitely," and "fully."  Other senses stressed "in conformity with the evidence, with reason"; "without fraud, injury or unfair advantage"; and "impartially," "accurately," and "objectively."

The full definitions provided:
"1a(1) : HANDSOMELY, BEAUTIFULLY<she likes to be overlooking the table with its *fairly* set dishes and silver — Eve Langley>
"(2) *of writing* : in the manner of a final draft : NEATLY, ELEGANTLY<one little essay … written out ~ for the press but never published — Richard Garnett †1906><you excelled in writing ~ — George Lillo>
b *obs* : SOFTLY, QUIETLY, GENTLY
c *obs* : COURTEOUSLY
"2a: to the full degree or extent : CLEARLY, DEFINITELY, ACTUALLY, PLAINLY, DISTINCTLY, FULLY<when the captain is on board and we are ~ off — Rachel Henning><amongst the boys scurrying to their ten-o'clocks I ~ caught sight of him — *Atlantic*><when I had him ~ seated in a hackney coach with me — James Boswell><the chestnut, finding himself ~ in for it, struck out gamely — Henry Lapham><badly wounded before the battle had ~ begun>
b: as it were : so to speak : ABSOLUTELY, POSITIVELY, DOWNRIGHT<the pages ~ quiver with indignation — Alban Baer><its waters … are ~ alive with crocodiles — Tom Marvel><~ boiling over with pride — Dorothy C. Fisher><~ lifted the waters of the gulf and hurled them through the city — A. F. Harlow>
c: SQUARELY, CLEANLY<one of her 8-inch salvos smashed ~ into a large warship — *Time*>
"3a: in conformity with the evidence, with reason, or with one's
merits : JUSTIFIABLY, PROPERLY, LEGITIMATELY, RIGHTFULLY<our business is to show that the doctrine is false and this we may ~ claim to have done — A. J. Ayer><his services have ~ earned him promotion>
"b(1) : in a just or lawful manner : without fraud, injury, or unfair advantage : EQUITABLY<fought and beat him ~> <come by something ~>
"(2) : without bias or distortion : IMPARTIALLY, CANDIDLY, ACCURATELY, OBJECTIVELY<the merits of the plea were ~ considered><~ described as all very decayed and horrible>
    "4: TOLERABLY, MODERATELY, RATHER<a ~ difficult scientific text><a ~ steady diet of lamb and beef>: moderately well<how are you getting along? Only ~>: PLEASANTLY<the evening passed away very ~ — Henry Lapham>"

In an attempt to find guidance in context, the court has examined the statutes and administrative rules in place at the time the legislature adopted ORS 314.667 as part of UDITPA. That effort, too, has been inconclusive. On the one hand, the court finds it clear that, even as of 1965, Defendant had laid the groundwork to require multinational enterprises to use worldwide combined reporting and was likely doing so.[42] *See* Reg. 314.280(1)-(B) (1964) (allowing Defendant to determine the "combined apportionable net income of all the corporations determined to be a part of the unit"); *id.* (apportioning by property, wages and sales "everywhere"); *id.* (referring to "unitary business carried on outside the state or in interstate or foreign commerce" and defining "state" to include "any foreign country or political subdivision thereof"). Knowledge of this fact could reasonably be imputed to the 1965 legislature, potentially creating an inference that the legislature would have viewed the tax resulting from the worldwide combined reporting method as an existing, fairly representative baseline against which to measure the tax resulting from any other method. *Cf. DuPont de Nemours v. State Tax Assessor*, 675 A2d 82 (Me 1996) (utilizing the Augusta Formula, discussed below).

Upon closer examination, however, the court is unable to draw any such inference. On the eve of UDITPA's enactment, worldwide combined apportionment was a creature of Defendant's rules promulgated under a broad delegation of authority in ORS 314.280 (1963). But the 1965 law made ORS 314.280 inapplicable to all taxpayers except public utilities and financial organizations, and nothing in UDITPA addressed combined reporting or granted similar rulemaking authority to Defendant to apply combined reporting to UDITPA taxpayers. *See* Or Laws 1965, ch 152, §§ 3, 22 (amending ORS 314.280 & 314.615). This gap in authority may well have been an oversight not indicative of any legislative disfavor of worldwide combined

---

[42] Where applicable, references to Defendant Department of Revenue includes its predecessor, State Tax Commission. *See* Or Laws 1969, ch 520, § 1 (establishing the Department of Revenue and transferring the powers and duties of former State Tax Commission commissioners to the director of Department of Revenue).

reporting, and in fact the Supreme Court later upheld Defendant's continued application of combined reporting despite the gap. *Coca Cola Co. v. Dept of Revenue*, 271 Or 517, 528, 533 P 2d 788, 793 (1975) ("The combined method of apportionment reporting is wholly consistent with, and a natural extension of, the apportionment method."). The fact that the 1975 legislature acted within weeks of the *Coca Cola* decision to confer express authority on Defendant to require combined reporting says nothing about the intention of the 1965 legislature. *See* Or Laws 1975, ch 760, §2. On this legislative record, the court finds it difficult to identify any specific evidence that the 1965 legislature would have considered the result under worldwide combined reporting a fair baseline.

The court concludes that its further examination of the text and context of ORS 314.667 does not change the Supreme Court's interpretation in *Twentieth Century-Fox* and later cases.

ii. Text, context and legislative history of ORS 317.267

In an effort to consider all relevant laws involved in the application of allocation and apportionment provisions, the court extends its analysis to the 1984 act that created Oregon's water's-edge system. By narrowing the tax base to exclude the income of corporations formed under the law of foreign countries, the 1984 law also raised the question of how the excluded income should be apportioned when it is paid or "attribute[d]" to Oregon shareholders as an actual or deemed dividend. *Moore*, 219 L Ed at 281 & *passim.*

The portion of the 1984 law most on point is the amendment to ORS 317.267, adding the provision now substantially codified in subsection (2). *See* Or Laws 1984, ch 1, § 9 (Special Session). The text of ORS 317.267(2) says nothing about apportionment of dividends. As context, however, the same 1984 law added the provisions now codified (with later amendments) as ORS 317.705, 317.710, and 317.715, as well as amendments to ORS 317.010, which do address apportionment and are the primary statutes governing Oregon's water's-edge reporting

system.  *See id.,* §§ 2-5; *Fresk v. Kraemer*, 337 Or 513, 520–521, 99 P 3d 282 (2004) ("Statutory context includes other provisions of the same statute * * * and the statutory framework within which the statute was enacted."); *see also* Or Laws 1985, ch 802.

The legislative history is particularly relevant.  Defendant directs the court to portions of the legislative history of the 1984 act in which proponents and legislators discuss the partial subtraction for dividends.  (*See* Def's Cross-Mot Summ J & Resp at 72-74 (Appendix A).)  A review of that record shows beyond doubt that the legislature was specifically concerned with the treatment of dividends from foreign subsidiaries.  Tape Recording, House Special Committee on Revenue, HB 3029, July 25, 1984, Tape 90, Side A, 1:08 (statement of Attorney Elizabeth Stockdale).  A significant colloquy also shows that the proponents, who included Governor Atiyeh and Defendant's principal attorney, arrived at the concept of granting a partial subtraction for dividends after many discussions with multinational corporate taxpayers and after considering other alternatives such as full inclusion of the dividends with factor representation. *Id*. at 18:00-19:00.  The court is persuaded that the 1984 legislature intended the subtraction of most of the dividend income from the tax base, now codified in ORS 317.267(2)(b), as a simpler, more readily administrable proxy for other possible forms of factor relief.

### iii.  Conclusion based on *Gaines* analysis

This additional review of statutory context and legislative history does not change the test under *Twentieth Century-Fox* and later cases.  However, the legislative history of the 1984 act persuades the court that the legislature provided the 80 percent subtraction under ORS 317.267(2) as a proxy for factor relief.  This shifts the issue in this case from whether Oregon should allow *any* factor relief for the 20 Percent Repatriation Amount to whether the *degree* of factor relief allowed is sufficient to meet the "fairly represent" test.

c. Has Plaintiff proved that the result under reinclusion fails the "fairly represent test?

The court considers first whether Plaintiff has proved that Oregon's UDITPA, after reincluding the Oregon Repatriation Amount in gross receipts under ORS 314.665(6)(a), lacks the requisite accuracy to satisfy the "fairly represent" test. The short answer is that Plaintiff has not attempted to do so. Plaintiff did provide an estimate at oral argument that reinclusion of the Oregon Repatriation Amount would result in a refund of $5,400,000. (Defendant calculates that the refund would be $4,600,000.) Either refund amount would get Plaintiff nearly halfway where it wants to go: depending on which party's calculation the court uses as a starting point, the refund amount based on reinclusion is 40 percent or 47 percent of the average of the amounts Plaintiff claims under its three proposed alternatives. *See* Table 3, in Part IV, above.[43]

Apart from characterizing the result under the court's interpretation of the reinclusion clause as having "ameliorated (though not fully resolved)" the alleged unfairness of the assessment, Plaintiff offers no theoretical basis to treat it as unfair. Under reinclusion, the identical amount is added to both taxable income of the Water's-Edge Group and to the denominator of the sales factor. This is because the 20 Percent Repatriation Amount is, after all, a dividend in the hands of the Water's-Edge Group. The fact that it consists of the earnings and profits of unitary affiliates, and therefore is "derived from" the Water's-Edge Group's own primary business activity, is relevant only because that fact satisfies the reinclusion clause and thus gives it the same status as an apportionable gross receipt that it would have had if the 1995 legislature had never enacted ORS 314.665(6)(a). Plaintiff nowhere explains why reinclusion does not provide complete factor representation. The court concludes that Plaintiff has not carried its burden of proving that statutory reinclusion does not fairly represent the business activities of the Water's-Edge Group in Oregon.

---

[43] Defendant's estimated refund assuming reinclusion ($4,600,000) is approximately 40 percent of the average refund that Plaintiff seeks under its three alternative methods ($11,393,590). Plaintiff's estimated refund ($5,400,000) is approximately 47 percent.

d.  Has Plaintiff proved that the result without reinclusion fails the "fairly represent" test?

The court next considers whether Plaintiff has proved that Oregon's UDITPA, *without*

{**reinclusion of the 20 Percent Repatriation Amount,**}[*applying Defendant's interpretation of*

*the reinclusion clause*]*,* lacks the requisite accuracy.  As the court implied in *Pacific Coca-Cola*,

the proffered alternatives to a statutory apportionment method can highlight the "connection, if

any, between evidence in the record and the contention that the statutory formula does not fairly

represent the business activity of the taxpayer in Oregon."  *Pacific Coca-Cola*, 307 Or at 672.

i.      Plaintiff's first proposal: include 20 percent of CFC sales in denominator

The court starts with Plaintiff's proposal to include 20 percent of CFC sales in the

denominator, as the most apposite of the three proposals.[44]  The court sees superficial appeal in

the proposed use of the CFCs' sales because they seem, at first, to be of like kind to the Water's-

Edge Group's sales--all are sales from developing, manufacturing, marketing, distributing,

selling, licensing, and supporting a wide range of software and hardware products, devices, and

services; therefore, under this proposal every dollar in the denominator comes from the same

type of sale.  But this apparent equivalence dissolves upon a closer look.  As just discussed, in

adopting a water's-edge system, the 1984 Oregon act narrowed the tax base, which necessarily

included transforming the Federal Repatriation Amount from an "intercompany transaction" that

would have been ignored under worldwide combined reporting into a dividend that is counted as

income.  Respecting that law change, the court concludes that Plaintiff's proposal is not

analytically sound because it would compare apples to oranges.  Plaintiff's first proposal thus

fails to reveal any inaccuracy in the assessment.

ii.     Plaintiff's second proposal: include 100 percent of Federal Repatriation Amount
        in the denominator.

---

[44] Plaintiff originally proposed including 100 percent of CFC sales in the denominator but acknowledged
on reply that "consistency" requires reducing those sales by 80 percent to correspond with the 80 percent dividend
subtraction that applies to the Federal Repatriation Amount.  (Ptf's Memo Further Supp Mot Summ J at 27-28.)

Plaintiff's second proposal would include 100 percent of the Federal Repatriation Amount in the denominator. Defendant argues that ORS 314.667 does not require any adjustment to the assessment, but that if any adjustment were made, principles of consistency would demand that no more than 20 percent of the Federal Repatriation Amount be added to the sales factor denominator. (*See* Def's Reply at 7). Plaintiff counters that, for purposes of a proposal under the safety valve statute,[45] it is not inconsistent to add 100 percent of the Federal Repatriation Amount to the denominator while adding only 20 percent to taxable income because "[i]t is reasonable to assume that the 80% DRD corresponds, roughly, to the ratio of costs to profits in the revenue resulting from the CFCs' foreign sales. Therefore, it is appropriate to use the gross deduction, rather than one-fifth of it, as an additional factor." (Ptf's Memo Further Supp Mot Summ J at 28.) Plaintiff offers no evidence that the CFCs' profit margin is 20 percent. More importantly, Plaintiff offers no rationale for including both the costs and the profits of the CFCs in the denominator; to do so is the equivalent of including the gross receipts of the CFCs in the denominator, which is Plaintiff's first proposal. Yet for the first proposal Plaintiff concedes that an 80 percent reduction is appropriate for the sake of consistency. The court concludes that Plaintiffs' second proposal lacks internal logic and thus fails to prove that the assessment is inaccurate.

iii. Plaintiff's third proposal: separate accounting

Plaintiff's third proposal is for "separate accounting," by which Plaintiff means that 100 percent, rather than 80 percent, of the Federal Repatriation Amount would be subtracted from federal taxable income and the apportionment percentage under the assessment would be left

---

[45] For purposes of computing Oregon taxable income under the *regular* statutory method, "[t]here shall be excluded from the sales factor * * * any amount subtracted from federal taxable income under" ORS 317.267(2). ORS 317.267(3).

unchanged.  (*See* Ptf's Memo Supp Mot Summ J at 25-26.)[46]  Plaintiff argues that its separate

accounting proposal

> "(1) fairly represents Microsoft's business activity and guarantees taxation of no more
> and no less than 100% of Microsoft's global income while maintaining the water's-edge
> limits adopted by the Oregon legislature; (2) fosters uniformity among UDITPA
> members inasmuch as it is the first cure for unfair apportionment listed by UDITPA; and
> (3) reflects the reality of Microsoft's Oregon business activity by taxing Microsoft on a
> share of the income earned by Microsoft's Water's Edge Group in the United States."

(Ptf's Memo Supp Mot Summ J at 26.)

In response, Defendant invokes the same kinds of facts that inform the court's conclusion

that the 20 Percent Repatriation Amount must be reincluded in gross receipts under

ORS 314.665(6)(a):

> "[I]t is *undisputed* that the Water's Edge Group held and managed the CFCs as
> part of the Group's unitary business and that Microsoft and all its domestic and
> foreign subsidiaries were engaged in a unitary business.  Stip Facts ¶ 2.  Microsoft
> makes no showing that its overseas profits repatriated to the United States
> pursuant to IRC § 965 have no reasonable connection so as to be wholly excluded
> from taxable income of all water's-edge tax jurisdictions.  Nor can it.  {**F**}[*f*]or
> example, its CFCs had agreements with the Water's Edge Group to share
> development costs.  Stip Ex 26; Stip Ex 28; Stip Ex 32 at 537.  As part of a
> 'global approach,' research and development was funded at the corporate level,
> while 'much of [its] segment level research and development is coordinated with
> other segments and leveraged across the company.'  Stip Ex 1 at 12.  Its strategy
> was global in ambition and scope.  * * * Wholly disassociating the CFCs'
> activities from the Water's Edge Group that oversees and manages them as part of
> the same unitary business, so as to exempt any return to the Water's Edge Group
> from its operational investment in the CFCs, or equivalently to apportion those
> returns to Oregon based on an Oregon apportionment factor of zero, is without
> merit."

(Def's Cross-Mot Summ J & Resp at 32-34 (emphasis in original; footnote and citation
omitted).)

---

[46] Plaintiff's third proposal would have the same economic effect as treating the 20 Percent Repatriation
Amount as "nonbusiness income," even though Plaintiff reported it as business income and nowhere argues that it is
properly treated as nonbusiness income.  *See* ORS 314.625, 314.640 (together requiring that dividends constituting
nonbusiness income be wholly assigned to state of commercial domicile).

The court agrees with Defendant that Plaintiff's separate accounting approach fails to reflect the economic reality of the unitary nature of the worldwide business, to which the parties have stipulated. For that reason, it runs directly counter to the analytical approach required under *Twentieth Century-Fox.* As a leading commenter has summarized:

> "The third inherent defect in separate accounting, as applied to a unitary business, goes to the merits of the method. As in *Alice in Wonderland*, it operates in a universe of unreality. For the essence of the separate accounting technique of dividing the income of a unitary business is to ignore the interdependence and integration of the business operations conducted in the various states and to treat them, instead, as if they were separate, independent, and nonintegrated. Thus, a business that owns and operates its own rubber plantations, produces rubber and related raw materials, manufactures a variety of products, ranging from tires, automobile and airplane parts to raincoats and galoshes, and sells them to manufacturers, wholesalers, and retailers, is a very different enterprise from the sum total of a rubber plantation, a rubber products manufacturer, and a wholesaler of rubber products, each separate, unaffiliated, and independent, and each owning and operating one piece of the business. The differences between such separate businesses and the national and multinational unitary businesses that dominate the U.S. economy are crucial, and their wealth, power, and profits are attributable to a considerable extent to the very fact that they are integrated, unitary businesses. It is for these reasons that separate accounting, which ignores the unitary character of such businesses, is not a satisfactory method for dividing taxable income among the states."

Hellerstein *et al., State Taxation* at ¶ 8.03; *cf. Southern Pacific Trans. Co. v. Dept. of Rev.,* 302 Or 582, 590-91, 732 P2d 18 (1987) (regarding formulary allocation of centrally assessed property value) ("The fundamental flaw in Southern Pacific's argument is that it assumes that the profitability of Cottonbelt can be ascertained without reference to Southern Pacific. * * * The profitability of 'bridge' railroads such as Cottonbelt depends upon integration with 'terminal' railroads such as Southern Pacific. The decision to include them in a unit is a decision to abandon efforts at separate valuation."). Because of these flaws, the court concludes that Plaintiff's third proposal fails to reveal any inaccuracy in the assessment.

    e. Conclusion under "fairly represent" test

Applying the test in *Twentieth Century-Fox*, the court concludes that Plaintiff has not carried its burden of proving that the assessment is inaccurate, or that the assessment fails to reflect the economic reality of the Water's-Edge Group's activities in Oregon. And Plaintiff has not carried its burden of proving that the degree of factor representation provided in ORS 314.665--with or without reinclusion of the 20 Percent Repatriation Amount in the denominator of the sales factor--is insufficient.

2.       *Relief Due to Unconstitutionality of Statutory Formula*

As an alternative to the statutory "fairly represent" test expressly stated in ORS 314.667, Plaintiff requests the same factor relief in order to "remedy unconstitutional results." *Twentieth Century-Fox*, 299 Or at 228. Plaintiff claims that the assessment violates the Commerce Clause, the additional requirements constituting the Foreign Commerce Clause, and the Due Process Clause.

a.       Commerce Clause

Plaintiff asserts that the large increase in Oregon taxable income caused by including the 20 Percent Repatriation Amount in income, while using the same apportionment percentage that would apply without it, is "grossly distortive." (Ptf's Memo Mot Summ J at 11, 15-17; Ptf's Memo Further Supp Mot Summ J at 3-4, 15-18.)

The court begins with the four-part test articulated by the United States Supreme Court to determine whether a state tax is constitutional under the Commerce Clause. The state tax must (1) be "applied to an activity with a substantial nexus with the taxing state", (2) be "fairly apportioned", (3) "not discriminate against interstate commerce", and (4) be "fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 279, 97 S Ct 1076, 51 L Ed 2d 326 (1977).

i.       Substantial nexus

Plaintiff argues that the activity at issue is the accumulation of earnings and profits by its CFCs over two decades; because the CFCs have no nexus with Oregon, Plaintiff asserts that Oregon's apportionment formula fails the substantial nexus requirement. (Ptf's Memo Further Supp Mot Summ J at 2-3.) Defendant points out that, while the CFCs may have no nexus with Oregon, the Water's Edge Group obviously does, as evidenced by the members' joining in the consolidated Oregon return. (Def's Cross-Mot Summ J & Resp at 54.) Nothing more is required, Defendant asserts, because it is the Water's Edge Group that is being taxed. (*Id*.) Defendant's argument is plainly correct, based on well-settled law. There is nothing unconstitutional about taxing the recipient of a dividend on its dividend income, simply because the payor lacks nexus with the taxing state. *See Mobil*, 445 US at 436 (rejecting taxpayer's argument that "dividends may not be taxed in Vermont because there is no 'nexus' between that State and either [taxpayer's] management of its investments *or the business activities of the payor corporations*." (emphasis added). The court agrees with Defendant and rejects Plaintiff's argument.

> ii.    Fairly apportioned

Under the Commerce Clause, an apportionment formula must be fair. *Container Corp. of America v. Franchise Tax Bd.*, 463 US 159, 169, 103 S Ct 2933, 77 L Ed 2d 545 (1983).

> A.    *Internal Consistency*

The first component of fairness is "internal consistency": "the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed." *Id*. Plaintiff argues that the method applied in the assessment is internally inconsistent because it does not reflect the fact that the CFCs' earnings and profits may have been taxed by foreign jurisdictions. (*See* Ptf's Memo in Supp Mot Summ J at 9 & n 8; Ptf's Memo Further Supp Mot Summ J at 16-17.) The court rejects this argument because, like

Plaintiff's no-nexus argument, it ignores the difference between taxing a shareholder on dividends and taxing the subsidiary on the operating income from which the dividend is paid. Worldwide combined reporting blurred those distinctions through the mechanism of "intercompany eliminations," but Plaintiff does not argue that Oregon must return to worldwide combined reporting. As applied to corporations, Oregon has, in essence, voluntarily defined the scope of the "unitary group" more narrowly than is constitutionally required. Under its water's-edge system, Oregon does not tax the CFCs, nor does it include their income in the measurement of the tax base except to the extent that a dividend is declared or is "attribute[d]" to the Water's-Edge Group by operation of law. *Moore*, 219 L Ed at 281 & *passim*. Therefore, internal consistency does not require Oregon to allow a credit or other adjustment to account for taxes the CFCs may have to pay to other jurisdictions. If every jurisdiction were to do the same, the Water's-Edge Group would not be taxed on more than 100 percent of its income. This is true regardless of whether the 20 Percent Repatriation Amount is reincluded in the apportionment formula under ORS 314.665(6)(a). Plaintiff thus conflates the fact that the 20 Percent Repatriation Amount is measured by the earnings and profits of the CFCs with the fact that the 20 Percent Repatriation Amount is a dividend under Oregon's water's-edge laws. *See DuPont*, 675 A2d 82 (overruling a previous decision, *Tambrands v. State Tax Assessor*, 595 A2d 1039 (Me 1991), which concluded that internal consistency test was violated when formula allowed no factor representation for foreign subsidiaries outside the water's-edge reporting group that paid dividends to US taxpayer). The court concludes that Plaintiff has not proved internal inconsistency.

    B.    *External Consistency*

The second component of fairness is external consistency: "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated."

*Container Corp.*, 463 US at 169. Courts will strike down an apportionment formula if the taxpayer can prove by clear and cogent evidence that the income attributed to the state is "'out of all appropriate proportion to the business transacted in that state'" or leads "'to a grossly distorted result.'" *Id.* at 170 (quoting *Hans Rees' Sons v. No. Carolina*, 283 US 123, 135, 51 S Ct 385, 75 L Ed 879 (1931) and *Norfolk & W. Ry. Co. v. Missouri State Tax Comm'n*, 390 US 317, 326, 88 S Ct 995, 19 L Ed 2d 1201 (1968) (*Norfolk & Western*){**)**}.

I. *Measure of "Gross Distortion"*

Plaintiff's argument for gross distortion, like its argument under the statutory "fairly represent" test, ignores the result under the reinclusion clause of ORS 314.665(6)(a). Plaintiff uses only the assessment as its starting point to prove gross distortion. Accordingly, Plaintiff has not carried its burden of proving that apportionment under the reinclusion clause grossly distorts its Oregon taxable income.

Turning to Plaintiff's external consistency argument based on the assessment itself, Plaintiff quantifies the distortion as follows:

- *More than ten-fold increase in tax.* Plaintiff complains of "a more than ten-fold (1000%) increase in tax burden for a substantially similar level of Oregon sales." (Ptf's Memo Further Supp Mot Summ J at 12.) This appears to refer to the fact that Plaintiff's tax due to Oregon for TYE 2017 was approximately $1,535,000, while the amount assessed for TYE 2018 exceeded $16 million. (*Id.* at 12.)
- *17.5 times average tax of the two preceding years.* Plaintiff goes on to state that, "For FY 2018 * * * Oregon has charged Microsoft $16.7M * * *, 17.5 times the average of the two preceding years." (*Id.*) (For TYE 2016, Plaintiff paid Oregon tax of $373,015, which when added to $1,535,000 for TYE 2017 is $1,908,015; the average of the tax paid for the two years is $954,008.)
- *8.26 times average tax of the four preceding years.* In response to Defendant's criticism that Plaintiff's "17.5 times" calculation "cherry picks" the two years preceding TYE 2018, Plaintiff calculates that its "Oregon sales were 4.7% above the average of the preceding *four years*, but its tax liability based on the standard formula is 8.26 times the average of the preceding *four years*." (Ptf's Memo Further Supp Mot Summ J at 8 n 7 (emphasis added); *see id.* at 9 n 8.)

Taken at face value, these comparisons fail to support Plaintiff's position because the dollar amount of tax in any given year depends on more than just the apportionment percentage. As Defendant argues, "One must do more than simply point to an increase in tax if large items of income are included in the tax base." (Def's Cross-Mot Summ J & Resp at 44.) Comparisons relevant to a distortion analysis under the Commerce Clause include the percentage difference between or among competing methods of computing the tax base or the tax amount, given the same set of inputs. *See Hans Rees' Sons*, 283 US at 134 (invalidating apportionment method later described in *Container Corp.* as creating a more than 250 percent increase in taxable income compared to taxpayer's methodology); *Norfolk & Western* at 328 (invalidating property tax allocation method where the assessed value of property was 200 percent of actual value); *cf. Moorman Mfg. Co. v. Bair*, 437 US 267, 271 n 4, 98 S Ct 2340, 57 L Ed 2d 197 (1978) (upholding state's income apportionment formula based solely on in-state sales despite resulting increase in tax base of approximately 48 percent); *Container Corp.,* 463 US at 184 (upholding income apportionment methodology where "the percentage increase in taxable income attributable to California between the methodology employed by appellant and the methodology employed by appellee comes to approximately 14%, a far cry from the more than 250% difference which led us to strike down the state tax in *Hans Rees' Sons, Inc.,* and a figure certainly within the substantial margin of error inherent in any method of attributing income among the components of a unitary business.")*; see generally* Hellerstein *et al., State Taxation* at ¶ 8.16[5] (proper standard for determining percentage of distortion is "comparing the percentage differences between the application of the different methodologies"); *see also Unisys Corp. v. Bd. of Finance & Revenue*, 571 Pa 139, 162-63, 812 A2d 448 (2002) (taxpayer "must establish a proper baseline" to evaluate external consistency). The court finds Plaintiff's year-to-year comparisons of apportionment percentage and tax amounts superficial and unpersuasive because

the other main input (overall taxable income) experienced a sudden, dramatic spike in the year at issue.

When expressed instead as the percentage difference between competing methods, Plaintiff's amended return takes the position that the assessment overstates its Oregon taxable income and Oregon tax amounts by approximately 182 percent.[47]  The court concludes that, if the relative percentage difference were the only test for unfair apportionment, Plaintiff's claim would not fail as a matter of law.  *Cf. PacifiCorp v. Dept. of Rev.*, __ OTR __ (TC 5411) (Or Tax, Jul 17, 2023) (slip op at 89-90) (alleged 9 percent inflation of allocation percentage not distortive as a matter of law).  But establishing that the size of the difference is within the range of potential gross distortion is only a first step that allows the court to go on to examine whether there is distortion at all.

## II.  *Whether the Result Under the Assessment Is "Distorted"*

This court interprets the United States Supreme Court's references to "distortion" as requiring that the assessment be inaccurate or not reflective of reality.  Plaintiff points to the fact that the sales factor "takes no account of overseas operations or of the period of time over which the CFCs accumulated the earnings and profits at issue."  (Ptf's Memo Further Supp Mot Summ J at 3.)  According to Plaintiff, this lack of factor representation inaccurately taxes "one-half of one percent of [Plaintiff's] much larger global business over two decades."  (*Id*. at 4, 17-18.)  However, it is precisely the fact that the one-time addition of the 20 Percent Repatriation

---

[47] Plaintiff's amended return seeks a reduction in Oregon taxable income from $225,218,064 (original return) to $79,872,371 (amended return), a difference of $145,345,693 ($225,218,064-79,872,371 = $145,345,693). (Stip Ex 24 at 2).  Accordingly, Plaintiff's amended return also seeks a reduction in Oregon Tax from $17,106,573 (original return) to $6,060,300 (amended return), a difference of $11,046,273 ($17,106,573-$6,060,300 = $11.046,273). *Id*.  Overall, Plaintiff claims that Defendant's method inflates its Oregon taxable income and resulting Oregon tax by ~182%. ($145,345,693(reduction in Oregon taxable income sought by Plaintiff)/$79,872,371 (amended Oregon taxable income) =~182% and ($11,046,273 (reduction in Oregon tax sought by Plaintiff)/$6,060,30 (amended Oregon tax amount) = ~182%.

Amount is derived from many years' worth of accumulated CFC earnings and profits that undermines Plaintiff's distortion claim. Defendant points out that at least one state supreme court has adopted as a baseline the amount of taxable income that would have resulted if worldwide combined reporting had applied to the entire Worldwide Group. (*See* Def's Cross-Mot Summ J & Resp at 40-46.) *DuPont*, 675 A2d 82 (Me 1996). Applying this comparison in a detailed analysis, Defendant has concluded that Plaintiff "has less aggregate Oregon taxable income over the period from TYE 2000 to TYE 2018 under [the method used in Defendant's assessment] than it would under a proxy for combined reporting." (Def's Cross-Mot Summ J & Resp at 51.)[48]

Under worldwide combined reporting, Defendant estimates that the Worldwide Group's Oregon taxable income over the period TYE 2000 to TYE 2018 would have been more than $872 million, which substantially exceeds the amount of Oregon taxable income that the Water's-Edge Group had over the same period ($734 million or $785 million, depending on whether single-factor apportionment is used for the early years). (*See* Def's Cross-Mot Summ J & Resp at 48-49.) This amounts to a savings in tax to the Water's-Edge Group of some $9.1 million or $5.7 million, respectively, which is conservative in Plaintiff's favor in applying only the lowest marginal tax rate of 6.6 percent. *See* ORS 317.061 and Or Laws 2009, ch 745, §§ 5-10 (introducing second marginal rate of 7.{**9**}[*7*] percent {**for tax years 2009 and 2010 and 7.6 percent for tax years after 2010**}). These estimates also are conservative in that they ignore the time value of money, *i.e.*, the fact that the Water's-Edge Group had the use of the cash it otherwise would have paid in tax under a worldwide combined method, which would not have allowed deferral of tax on the income earned by the CFCs. Using an approximately four percent

---

[48] Defendant's "proxy method" uses stipulated facts, facts represented by Plaintiff in support of Plaintiff's alternative proposals, and facts from Plaintiff's public financial reports to estimate the worldwide income and sales of the unitary group, including the income and sales of the CFCs. (*See* Def's Cross-Mot Summ J & Resp at 46-53.)

interest rate compounded annually, Defendant estimates that Plaintiff had an additional savings of approximately $1.7 million in Oregon tax by deferring tax on the Oregon Federal Repatriation Amount until TYE 2018. (*See* Def's Cross-Mot Summ J & Resp at 52; Decl of Larimer at 2-4, ¶¶ 2-8.) Plaintiff does not contest the accuracy of Defendant's calculations, only their relevance.[49] (*See* Ptf's Memo Further Supp at 18 (referring to Defendant's comparison as "a convoluted hypothetical"); Def's Reply at 10.)

The origin of the Federal Repatriation Amount in the operating income of Plaintiff's unitary business makes the Augusta Formula a highly persuasive way to examine the fairness of the assessment, because the United States Supreme Court has upheld worldwide combined reporting as a fair method for Commerce Clause purposes. *See Container Corp.*, 463 US at 184; *Barclays Bank v. Franchise Tax Bd. Of California*, 512 US 298, 330-331, 114 S Ct 2268, 129 L Ed 2d 244 (1994). Because the assessment in this case results in no greater amount of tax than would have been imposed under the worldwide combined reporting approach over the period that the Water's-Edge Group enjoyed the deferral of income from the CFCs, the court concludes

---

[49] The court finds that Defendant necessarily adapts the Augusta Formula as laid out in *Du Pont* in order to apply it to the facts of this case, but that these adaptations in no way affect the validity of the Augusta Formula as "a check on the tax assessed on the income of a multijurisdictional corporation with foreign subsidiaries * * *." *Du Pont*, 675 A2d at 91.

- *Du Pont* involved only three tax years (1985-87) and, apparently, current-year dividends, while Defendant's computations extend the Augusta Formula over the nearly twenty-year period during which the CFCs accumulated the earnings and profits that were deemed distributed in TYE 2018.

- In *Du Pont*, the taxpayer sought to altogether exclude the foreign-subsidiary dividends as nonbusiness income, causing the court to evaluate that scenario as determination "(C)." *See id.* Plaintiff in this case does not request that relief, and to the extent that Plaintiff's separate accounting proposal amounts to the same thing, the court has already rejected it as contrary to the unitary business principle that underlies the reinclusion clause of ORS 314.665(6)(a). Thus, this court sees no need to include a third comparison in the Augusta Formula.

- *Du Pont* applied UDITPA's original three-factor apportionment formula then in effect in Maine, while Oregon law for the tax year at issue and most of the tax years of the deferral period used single-factor apportionment. Plaintiff raises no issue as to the fairness of single-factor apportionment. (Ptf's Memo Further Supp at 10 ("Microsoft is not asking that the State's single-factor approach to apportionment be struck down, but rather that factor representation be given, or a separate accounting applied, to eliminate or reduce gross distortion.").)

that the assessment satisfies the external consistency requirement of a fair apportionment of the business income of the Water's-Edge Group.

### iii. Not discriminatory

"Besides being fair, an apportionment formula must, under the Commerce Clause, also not result in discrimination against interstate or foreign commerce." *Container Corp.*, 463 US at 170. Plaintiff argues that the method used for the assessment discriminates against foreign commerce "by failing to include any of the deemed dividend payers' factors in the Sales Factor apportionment formula." (Ptf's Memo Supp Mot Summ J at 12.) Plaintiff relies principally on *Kraft Gen. Foods, Inc. v. Iowa Dep't of Rev.*, 505 US 71, 112 S Ct 2365, 120 L Ed 2d 59 (1992), but the court finds that case distinguishable. In *Kraft*, the Court concluded that Iowa's income tax law, which required each corporation subject to tax to file its own separate return, discriminated against foreign commerce by including in the taxable income of a corporation doing business in Iowa 100 percent of a dividend paid by a foreign subsidiary not doing business in Iowa, while allowing a 100 percent deduction for a dividend paid by a domestic corporation not doing business in Iowa.[50] However, the Court noted:

> "If one were to compare the aggregate tax imposed by Iowa on a unitary business which included a subsidiary doing business throughout the United States (including Iowa) with the aggregate tax imposed by Iowa on a unitary business which included a foreign subsidiary doing business abroad, it would be difficult to say that Iowa discriminates against the business with the foreign subsidiary. Iowa would tax an apportioned share of the domestic subsidiary's entire earnings, but would tax only the amount of the foreign subsidiary's earnings paid as a dividend to the parent.
>
> "In considering claims of discriminatory taxation under the Commerce Clause, however, it is necessary to compare the taxpayers who are 'most similarly situated.' *Halliburton Oil Well Cementing Co. v. Reily*, 373 US 64, 71, 83 S Ct 1201, 1205, 10 L Ed 2d 202 (1963). A corporation with a subsidiary doing business in Iowa is not situated similarly to a corporation with a subsidiary doing

---

[50] *See Kraft*, 505 US at 74 n 9 ("Iowa is not a State that taxes an apportioned share of the entire income of a unitary business, without regard for formal corporate lines.").

business abroad. In the former case, the Iowa operations of the subsidiary provide an independent basis for taxation not present in the case of the foreign subsidiary. A more appropriate comparison is between corporations whose subsidiaries do not do business in Iowa."

*Kraft*, 505 US at 80 n 23.

This court understands the scenario posited in the last sentence of footnote 23 as follows: two parent corporations are subject to tax in a taxing state. Parent 1 conducts a unitary business together with a domestic subsidiary; Parent 2 conducts a unitary business together with a foreign subsidiary. Neither subsidiary does business in the state. The footnote invites a comparison of how the income earned by each subsidiary is taxed to the respective parent.

Turning to the first sentence of the footnote, if the comparison shows that the state taxes "an apportioned share of the domestic subsidiary's entire earnings, but would tax only the amount of the foreign subsidiary's earnings paid as a dividend to the parent," then "it would be difficult to say that [the state] discriminates" against Parent 2 on the grounds that its subsidiary is engaged in foreign country. *Id.*

This court concludes that the skepticism expressed by the *Kraft* Court is even more strongly warranted under Oregon law than under the scenario posited in the footnote. In the footnote, the Court suggests that no discrimination is present where *100 percent* of the foreign subsidiary's dividend is taxed to Parent 2, as long as an apportioned share of the domestic subsidiary's earnings are taxed to Parent 1. Oregon's consolidated return scheme taxes only *20 percent* of a CFC's dividend, while taxing an apportioned share of the domestic subsidiary's earnings. *Cf. DuPont*, 675 A2d at 88 ("Because the income of the unitary domestic affiliates is included, apportioned, and ultimately directly taxed by Maine as part of the parent company's income, the inclusion of dividends paid by foreign subsidiaries does not constitute the kind of

facial discrimination against foreign commerce that caused the Supreme Court to invalidate Iowa's tax scheme in *Kraft*.").  Moreover, under the reinclusion clause of ORS 314.665(6)(a), the chance of material disadvantage that could be characterized as discrimination is further reduced because the CFC's dividend is itself eligible to be apportioned, like any other dividend that is business income.  Plaintiff has failed to persuade the court that the method used in the assessment discriminates against foreign commerce.

> 4.      Fairly related

Finally, a state tax must be "fairly related to the services provided by the State." *Complete Auto*, 430 US at 279.  More specifically, the Court has declared that the "relevant inquiry under the fourth prong of the *Complete Auto Transit* test is not * * * the *amount* of the tax of the *value* of the benefits allegedly bestowed * * *." *Commonwealth Edison Co. v. Montana*, 453 US 609, 625, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (emphasis in original). Rather, beyond the threshold requirement of substantial nexus, "the *measure* of the tax must be reasonably related to the extent of the contact * * *." *Id.* at 626 (emphasis in original) (severance tax "measured as a percentage of the value of the coal taken" held in proper proportion to mining company's in-state activities).  In *Goldberg v. Sweet*, the Court further clarified that the "fairly related" test "focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue." 488 US 252, 267, 109 S Ct 582, 102 L Ed 2d 607 (1989) (upholding gross receipts tax measured by calls originating or terminating in the state).

Plaintiff argues that Oregon provided no services related to the activity at issue here, the foreign earnings.  (Ptf's Memo Mot Summ J at 12; Ptf's Memo Further Supp Mot Summ J at 8.) This argument fails under *Goldberg* as quoted above.

Taxpayer argues further that the "huge jump" in the tax due for TYE 2018 does not reflect "any increase in the services provided by Oregon[.]" (Ptf's Memo Mot Summ J at 13; Ptf's Memo Further Supp Mot Summ J at 8-9.) This argument fails because, to the extent that the "fairly related" requirement differs from the "fairly apportioned" requirement, *Commonwealth Edison* teaches that the former emphasizes whether the tax is structured to reflect the extent of the taxpayer's contact with the state. Oregon's tax, like most state and local net income taxes in the United States, uses the ratio of in-state sales to everywhere sales to determine the proportion of overall income that is taxable. *See, e.g.* State Primary Apportionment Factors for Tax Year 2020, Tax Foundation, https://taxfoundation.org/taxedu/glossary/apportionment/ (accessed Aug 22, 2024); c*f.* State Apportionment of Corporate Income, Federation of Tax Administrators, https://taxadmin.memberclicks.net/assets/docs/Research/Rates/apport.pdf (accessed Aug 22, 2024). "Sales" is similar to the concepts of "value" and "gross charge" that the Court concluded satisfied the "fairly related" requirement in *Commonwealth Edison* (453 US at 626) and *Goldberg* (488 US at 258). Although the tax in this case is more complex because it couples "sales" with the vast concept of "net income," the court cannot conclude that the basic structure of the corporation excise tax violates the "fairly related" requirement. As the court understands the cases, whether specific provisions of state law are sufficiently fair, such as those governing factor representation, is to be determined under the "fair apportionment" or other prongs of the *Complete Auto* test, as discussed above.

b.      Foreign Commerce Clause

In *Barclays,* 512 US at 311, the United States Supreme Court declared:

"A tax affecting *foreign* commerce therefore raises two concerns in addition to the four delineated in *Complete Auto*. The first is prompted by the enhanced risk of multiple taxation.  The second relates to the Federal Government's capacity to

speak with one voice when regulating commercial relations with foreign governments."

(Emphasis in original; citations and internal quotation marks omitted.) This court focuses on Plaintiff's "multiple taxation" argument, as Plaintiff has acknowledged that it does not rely on any argument about the federal government's capacity to "speak with one voice." (Statement of Robert Mitchell, Oral Argument, Apr 4, 2023, 1:35.) [51]

Plaintiff contends that the assessment results in "*actual* multiple international taxation," citing *Japan Line, Ltd. v. Los Angeles County*, 441 US 434, 451, 99 S Ct 1813, 60 L Ed 2d 336 (1979). (Ptf's Memo Supp Mot Summ J at 13 (emphasis in original).) In *Japan Line,* the Court declared impermissible California's imposition of ad valorem property tax on shipping containers that were physically present in the state on the annual assessment date. *See id.* at 437, 451-52. Meanwhile, under Japanese law, the same shipping containers also were "subject to property tax in Japan and, in fact, are taxed there." *Id.* at 436. The Court observed that, within the United States, the Court, in its enforcement of the Commerce Clause, can prevent multiple taxation of the full value of an instrumentality of commerce by requiring the value to be apportioned among states having jurisdiction to tax it. *See id.* at 446-47. However, when a foreign sovereign asserts a right to tax the full value, "[i]f a State should seek to tax the same instrumentality on an apportioned basis, multiple taxation inevitably results." *Id.* at 447. The Court found California's levies impermissible because they produced "multiple taxation in fact." *Id.* at 451-52, 454.

Plaintiff seeks the same result in this case, pointing to evidence that the CFCs in this case "already paid foreign tax on much of the earnings and profits that comprise the deemed dividend

_____

[51] As in other parts of its analysis, Plaintiff ignores the effect of reinclusion of the 20 Percent Repatriation Amount under ORS 314.665(6)(a). Because the court concludes that the assessment does not violate the "multiple taxation" prohibition, the court concludes that the assessment, as reduced by the partial refund attributable to reinclusion, does not violate it, either.

* * *." (Ptf's Memo Supp Mot Summ J at 13 (citing Stip Ex 21 at 329).) Defendant does not contest the fact that the CFCs, in the aggregate, paid some foreign tax, although Defendant contends that "some of the CFCs appear to have paid little or no foreign tax on their income." (Def's Reply at 32 n 19.) Defendant's main argument is that later United States Supreme Court cases have refined the "multiple taxation" test, such that actual payment of tax to a foreign jurisdiction "is not a trump card." (Def's Reply at 30.) This court agrees with Defendant, and the court concludes further that Plaintiff has not shown that the assessment exceeds the more nuanced description in *Container Corp.* and *Barclay's* of the nondiscrimination requirement.

In *Container Corp.*, the Court declined to invalidate California's system of taxing an apportioned share of income using a worldwide combined reporting methodology, even though the taxpayer showed that "actual double taxation" had occurred because "some of the income taxed without apportionment by foreign nations as attributable to [the taxpayer's] foreign subsidiaries was also taxed by California as attributable to the State's share of the total income of the unitary business * * *." 463 US at 187. The Court found this result tolerable under *Japan Line* because "the double taxation in this case, although real, is not the 'inevitabl[e]' result of the California taxing scheme." *Id.* at 188. Rather, the double taxation in *Container Corp.* arose from the interaction of the two main approaches to cross-border taxation: apportionment (California's chosen approach) and "arm's-length" taxation (used by "most foreign nations" and essentially the same as separate accounting). *Id.* at 163. The Court explained that "[w]hether the combination of the two methods results in the same income being taxed twice or in some portion of income not being taxed at all is dependent solely on the facts of the individual case." *Id.* at 188.

Eleven years after *Container Corp.*, the Court again considered California's worldwide combined reporting system in *Barclays*, which included a multinational enterprise headquartered

outside the United States.[52]  *Barclays*, 512 US at 302 ("Barclays Bank PLC * * * is a United Kingdom corporation * * *.").  With respect to the "multiple taxation" prong of the Foreign Commerce Clause issue, the Court expressly adhered to its reasoning in *Container Corp.*, highlighting that multiple taxation was not the inevitable result of the tax, and that the reasonable alternative, "some version of the separate accounting/arm's-length approach * * *[,] could not eliminate the risk of double taxation and might in some cases enhance that risk."  *Id.* at 318-19 (internal quotations and citations omitted); *see id.* at 320 ("We therefore adhere to the precedent set in *Container Corp.*").

In light of *Container Corp.* and *Barclays*, this court once again concludes that the Augusta Formula analysis proffered by Defendant carries the day.  The United States Supreme Court has twice upheld the result under a worldwide combined reporting system, even when that result has caused actual double taxation.  In this case, because Oregon includes only 20 percent of the Federal Repatriation Amount in business income, the assessment imposed on the Water's-Edge Group is less than it would have been under the type of method approved in *Container Corp.* and *Barclays*.  That comparison does not count the additional benefit to the Water's-Edge Group of many years of deferral.  The court concludes that the assessment does not violate the "multiple taxation" prohibition under the Foreign Commerce Clause.

      c.      Due Process Clause

---

[52] Although worldwide combined reporting was still in effect for the tax years at issue, by the time the Court heard *Barclays*, "battalion[s] of foreign governments [had marched] to Barclays' aid, deploring worldwide combined reporting in diplomatic notes, *amicus* briefs, and even retaliatory legislation."  *Id.* at 320.  California had "responded to this impressive political activity" by adopting an optional water's-edge combined reporting system materially comparable to Oregon's consolidated return system.  *Id.*; *see id.* at 306-07.

Finally, Plaintiff argues that the assessment violates the Due Process Clause of the United States Constitution.[53] (Ptf's Memo Mot Summ J at 15-18.) As the Oregon Supreme Court recently explained:

> "'In the context of state taxation, the Due Process Clause limits States to imposing only taxes that bear fiscal relation to protection, opportunities and benefits given by the state.' *North Carolina Dept. of Revenue v. The Kimberley Rice Kaestner 1992 Family Trust*, ___ US ___, ___, 139 S Ct 2213, 2219, 204 L Ed 2d 621 (2019) (internal quotation marks and citation omitted). There are two steps in that analysis. First, 'there must be some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.' *Id*. at ___, 139 S Ct at 2220 (internal citation and quotation marks omitted). Second, 'the income attributed to the State for tax purposes must be rationally related to values connected with the taxing State.' *Id*. at ___, 139 S Ct at 2220 (internal citation and quotation marks omitted)."

*OOMA, Inc. v. Dept. of Revenue*, 369 Or 95, 99-100, 501 P3d 520 (2021).

As to the first step, Plaintiff concedes (as it must, based on its employment of dozens of Oregon employees) that "Oregon can claim a link to Microsoft * * *." (Ptf's Memo Mot Summ J at 15; *see* Stip Facts at 2, ¶¶ 4-5.) However, Plaintiff contends that the assessment fails at the first step because "Oregon has no connection to the Section 965 deemed dividend that it seeks to tax. *Allied-Signal, Inc. v. Director*, 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992) ('in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax.')." The court disagrees. The minimum connection requirement is satisfied because (1) Plaintiff concedes the requisite "minimum connection between [the] state and the person" (the Water's-Edge Group), and (2) the Federal Repatriation Amount is a dividend that is included in the *federal* taxable income of the Water's-Edge Group. *See Mobil*, 445 US at 437-40 (rejecting taxpayer's argument that dividends from

---

[53] As with its other arguments, Plaintiff does not distinguish between the assessment and the assessment as modified by reinclusion of the 20 Percent Repatriation Amount.

foreign subsidiaries "must be excepted from the general principle of apportionability because [they lack] a satisfactory nexus with appellant's business activities in Vermont.").[54]

The remaining due process issue is whether the portion of the Federal Repatriation Amount that is included in *Oregon* taxable income is "rationally related" to values connected with Oregon. As to this step, the Oregon Supreme Court has employed the same analysis as under the fair apportionment component of the Commerce Clause. *See Southern Pacific*, 302 Or at 588 ("The limits imposed by the commerce clause and the due process clause of the fourteenth amendment are much alike."); *PacifiCorp v. Dept. of Rev.*, __ OTR __ (Jul 17, 2023) (slip op at 82-90) (appeal pending) (applying *Southern Pacific* to test allocation of property value to Oregon); *see also* Hellerstein *et al., State Taxation* at Intro Pt III (Jul 2024) ("There is frequently an overlap between the Due Process Clause and the Commerce Clause as applied to state taxation of interstate or foreign commerce, since extraterritorial taxation may also impose an undue burden on interstate commerce."). The parties do not argue otherwise. (*See* Ptf's Memo Supp Mot Summ J at 8-9 (arguing lack of internal and external consistency for purposes of both Commerce Clause and Due Process Clause).) The court thus rejects Plaintiff's Due Process Clause arguments for the reasons articulated above with respect to the fair apportionment requirement of the Commerce Clause.

---

[54] Plaintiff also misapplies the quotation from *Allied-Signal*. That passage refers, by express citation, to the use tax at issue in *Quill Corp. v. North Dakota*, 504 US 298, 306-308, 112 S Ct 1904, 119 L Ed 2d 91 (1992), *overruled on other grounds*, *South Dakota v. Wayfair, Inc.*, 585 US 162, 138 S Ct 2080, 201 L Ed 2d 403 (2018). In contrast to that tax, Oregon's corporation excise tax is not a "tax on an activity." *Compare* N.D. Cent. Code § 57-40.2-02.1 (1991) (tax measured by "*purchase* price of the property" "*purchased* at retail for storage, use, or consumption in this state") (emphases added) *with* ORS 317.070 (tax measured by "Oregon taxable income," defined under IRC §§ 61(a) and 63 as federal gross income "from whatever source derived" less deductions and subject to Oregon modifications and apportionment under ORS 317.010(8) and (10)).

## VI. CONCLUSIONS

Under ORS 314.665(6)(a), the court concludes that the 20 Percent Repatriation Amount must be reincluded in the sales factor for the Water's-Edge Group, which will result in a refund to Plaintiff in an amount to be determined. The court directs the parties to confer to seek agreement on the amount of the refund and to advise the court if assistance is needed.

As to Plaintiff's arguments under the statutory "fairly represent" standard and under constitutional standards, the court concludes that Plaintiff has failed to carry its burden of proof as required under ORS 314.667. The court is not persuaded that the assessment, whether or not modified by reinclusion of the 20 Percent Repatriation Amount pursuant to ORS 314.665(6)(a), fails any of those standards. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is granted in part and denied in part; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment is granted in part and denied in part.

Dated this 29th day of April, 2025.

_____